**NATIONAL COMMUNICATIONS ASSOCIATION, INC.,**
**Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY,**
**Defendant.**

**No. 92 Civ. 1735 (LAP).**

United States District Court,
S.D. New York.

Feb. 19, 1993.

Motion for Reconsideration, Dissolution, or Stay of Preliminary Injunction Denied
April 2, 1993.

Fabricant, Yeskoo & Colangelo by Richard C. Yeskoo, New York City, for plaintiff.

Pitney, Hardin, Kipp & Szuch by Frederick L. Whitmer, Morristown, NJ, Edward R. Barillari, American Telephone and Telegraph Co., Basking Ridge, NJ, for defendant.

OPINION and ORDER

PRESKA, District Judge.

Plaintiff, National Communications Association, Inc. ("NCA"), has moved pursuant to Fed.R.Civ.P. 65 for a preliminary injunction modifying the recently implemented billing practice of defendant, American Telephone and Telegraph Company ("AT & T"), in connection with AT & T's provision of long distance voice telecommunications service to NCA and NCA's customers. For the reasons set forth below, a preliminary injunction will be issued enjoining AT & T from maintaining with respect to NCA the changes made to its billing practice in November 1992. In issuing the preliminary injunction, the Court seeks to maintain the status quo as it existed between the parties prior to November 1992 and, under the doctrine of primary jurisdiction, directs NCA to seek a determination from the Federal Communications Commission (the "FCC") as to the merits of its claims regarding AT & T's billing practice.

## I. Background

As reviewed at greater length in the Court's recent decision granting in part and denying in part AT & T's motion to dismiss the complaint, 808 F.Supp. 1131, this lawsuit arises out of NCA's allegations that AT & T discriminates against NCA and other reseller customers in its sale of long distance voice telecommunications service through "Software Defined Networks" ("SDN").[1] SDN is a class of telecommunications service which, pursuant to tariffs filed by AT & T with the FCC, provides a discount to companies which commit to a minimum monthly usage of telecommunications service.

AT & T sells telecommunications service under the SDN tariffs both (1) to end-user customers directly and (2) to reseller customers, such as NCA, which resell the telecommunications service to their own customers—companies which cannot individually commit to the minimum monthly usage necessary to receive telecommunications service under the SDN tariffs directly from AT & T. In other words, the resellers allow small companies to pool their demand for telecommunications service in order to access the SDN program.

NCA alleges in its complaint that AT & T discriminates against NCA and the other resellers in its provision of services under the SDN tariffs in order to cause the resellers' customers to switch to Pro-WATS, Multi-Location WATS, or some other long distance voice telecommunications service which AT & T can provide directly to the resellers' customers. Specifically, NCA claims that AT & T provides the resellers with fewer and inferior services than those provided by AT & T to its non-reseller customers. NCA alleges that this disparate treatment can be found in several areas including: assignment of personnel, account initiation, addition of customer locations, order processing, provision of interexchange trunks, and billing.

As stated above, the instant motion concerns AT & T's billing practice. Both parties have submitted affidavits which substantially concur regarding the manner in which AT & T has billed NCA and NCA's customers. For purposes of deciding NCA's application for a preliminary injunction, I find the following relevant facts regarding AT & T's billing practice.

When NCA began purchasing telecommunications service under SDN tariffs from AT & T in 1990, AT & T began billing NCA's customers directly every month. NCA's customers then paid AT & T. From these collections, AT & T remitted to NCA a portion of the funds reflecting the SDN customer discount.[2] To the extent that an NCA customer did not pay the full amount of its bill, AT & T showed a past due balance on the next bill sent to the customer; from the portion of the collections which would normally be transferred to NCA, i.e., that portion representing the SDN discount, AT & T deducted the sum of all of NCA's customers' past due balances aged over 60 days. In this manner, AT & T was assured of receiving all monies due it within 60 days, and NCA was rightfully held responsible for the total usage of telecommunications service by its customers. Past due amounts appeared as such on the bills of NCA's individual customers even after AT & T deducted those amounts aged over 60 days from the collections normally transferred to NCA.

In November 1992, AT & T changed its billing practice. AT & T began withholding from NCA all amounts due from an NCA customer over 60 days if any amount was due from the customer over 120 days (the "120-day rule"); notably, this withholding would also have occurred under AT & T's prior billing practice which withheld from NCA its customers' past due balances aged over 60 days. Rather, the dramatic aspect of the November 1992 change in billing practice was AT & T's crediting to the NCA customer the amount withheld from NCA, thereby reducing the total amount due on the NCA customer's bill. Thus, an NCA customer with an outstanding amount due more than 120 days never

---

**1.** NCA's complaint seeks relief against AT & T based on the following causes of action: (1) discrimination under the Communications Act of 1934, 47 U.S.C. §§ 151, *et seq.;* (2) monopolization in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (3) attempted monopolization in violation of § 2 of the Sherman Act; (4) price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13; and (5) violation of SDN tariffs and federal common law. AT & T's motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Robinson–Patman count for failure to state a claim was granted.

**2.** As AT & T's customer, NCA received a bill representing the total usage of NCA's customers, and the portion of the collections from NCA's customers retained by AT & T was applied to NCA's bill.

*appears* to be past due beyond 60 days regardless of the actual status of the account. To repeat, AT & T's new billing practice *credits* an NCA customer's bill for amounts past due over 60 days if the NCA customer has outstanding amounts due over 120 days. The "credit" is at the expense of NCA; AT & T withholds the sum of all "credits" given to NCA's customers from the total payments AT & T receives from all of NCA's customers.[3]

NCA foresaw significant problems with this new billing system. NCA's primary concern was that its customers with balances due over 120 days would believe that they did not ever need to pay their balances due over 60 days because that amount would be shown as a credit on their bills, not a past due amount. Thus, NCA would be paying for telecommunications service used by these customers with limited hope of recovery.[4] The severity of this potential problem was magnified by the fact that a substantial number of NCA's customers had a balance due beyond 120 days because they had arranged with NCA to pay their balance over the course of several months; this arrangement became necessary after AT & T failed to bill the customers for several months and then issued disproportionately large bills to them.

Instead of accepting AT & T's modified billing system, NCA undertook to issue its own bills to its customers. Since November 1992 when NCA began processing October 1992 bills for its customers, AT & T has provided NCA with various billing materials in a purported attempt to help NCA bill its customers. These materials include statements identifying the accounts of NCA customers with a past due balance beyond 120 days to which AT & T has applied credits pursuant to the 120-day rule. However, NCA cannot from these materials distinguish between that portion of the credit ascribed by AT & T to the customer which is due to the 120-day rule and that portion which is due to payments actually made by the customer to AT & T.

Thus, it is impossible for NCA to bill its customers accurately.

## II. *Primary Jurisdiction*

### A. *In General*

Upon reviewing the parties' submissions regarding the preliminary injunction, the Court *sua sponte* requested the parties to brief the issue of primary jurisdiction and whether the Court should refer NCA's motion for a preliminary injunction to the FCC. In response, the parties submitted short letters which urged the Court to retain jurisdiction on NCA's motion and decide in favor of their respective positions. The Court considered these submissions in arriving at its decision.

 The well established doctrine of primary jurisdiction permits the judiciary to refer a matter extending beyond "the conventional experience of judges" or falling within the realm of administrative discretion to the administrative agency possessing expertise in the matter at issue. *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952); *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 851 (2d Cir. 1988). The doctrine

> ensures " '[u]niformity and consistency in the regulation of business entrusted to a particular agency [and]' " ... recognize[s] that, with respect to certain matters, "the expert and specialized knowledge of the agencies" should be ascertained before judicial consideration of the legal claim.

*Goya Foods,* 846 F.2d at 851 (citations omitted). At heart, the doctrine allows for the proper and rational balancing of the roles of courts and administrative agencies.

The courts have focused upon four factors in deciding where this balance is properly struck in a given case:

1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's partic-

---

**3.** As stated above, AT & T received all monies due it within 60 days under the former billing practice—either directly from NCA's customers or by withholding amounts from funds which would otherwise have been remitted to NCA. The November 1992 change was one of accounting methodology—AT & T apparently decided that it did not want to carry account balances on bills sent to NCA's customers for extended periods of time. In short, AT & T began crediting NCA's customers rather than NCA for money which AT & T withheld from NCA.

**4.** If the NCA customer did pay its true past due balance, AT & T would have allotted the payments properly to NCA; in other words, once AT & T credited an NCA customer with a past due amount, NCA did not lose entirely the ability to recover the money owed it by the customer.

ular field of expertise, 2) whether the question at issue is peculiarly within the agency's discretion, 3) whether there exists a substantial danger of inconsistent rulings, and 4) whether a prior application to the agency has been made.

*RCA Global Communications, Inc. v. Western Union Tel. Co.*, 521 F.Supp. 998, 1006 (S.D.N.Y.1981) (citation omitted).

## B. *Application of the Doctrine*

■ Setting aside for a moment the standard for issuance of a preliminary injunction and instead focusing upon the forum best suited to resolve the questions surrounding AT & T's billing practice, I find that the FCC is equipped better than this Court to determine what billing practice AT & T must maintain.

As noted above, AT & T provides SDN service pursuant to tariffs filed with the FCC. However, upon reviewing the tariff materials regarding SDN, one finds scant discussion of AT & T's obligations regarding billing. To the extent that the SDN tariffs regulate billing, they merely provide for an option denominated 'Location Account Billing Option' ("LABO"). F.C.C. Tariff No. 1 § 6.4.1.C.2. LABO allows an SDN customer to designate up to 6,000 locations where AT & T provides it with telecommunications service and to have AT & T separately bill each of those locations. *Id.* AT & T then holds each of the billed locations responsible for paying the billed amounts, although the multiple locations are viewed together in computing the SDN discount. *Id.*

Although the tariffs do not provide a sufficiently detailed description of LABO to facilitate a definitive comparison between LABO and AT & T's billing practice vis-a-vis NCA, LABO does resemble the manner in which AT & T billed NCA prior to November 1992. In fact, NCA appears to have been under the impression that LABO governed AT & T's billing practice. However, NCA does not qualify for LABO because the tariffs require that the SDN customer and its multiple designated locations operate in a common business. *Id.*

AT & T contends that aside from LABO, two other mechanisms exist for billing under SDN. Under "Network Billing," AT & T provides the SDN customer with a single bill for all of the customer's locations. Under "Multi-location Billing," AT & T provides a separate invoice to each of the customer's locations but holds the SDN customer—and not the individual locations—responsible for the usage of telecommunications service by all of the locations. The SDN tariffs do not appear to address Network Billing or Multi-location Billing; AT & T seems to have developed these two billing options unilaterally.

According to AT & T, NCA seeks to receive billing according to LABO but does not qualify for that option because NCA and NCA's customers do not have a common business relationship. Instead, AT & T argues that NCA has elected Multi-location Billing and that AT & T's billing practice, as instituted in November 1992, is consistent with Multi-location Billing. NCA, as already noted, has expressed apprehension regarding that billing practice, as to the 120-day rule in particular, so extreme as to prompt NCA to undertake to bill its customers instead of allowing AT & T to bill them.

From my review, I conclude that the SDN tariffs do not address the manner in which AT & T must bill NCA. As stated above, AT & T contends that Multi-location billing applies to NCA, but the tariffs do not speak to Multi-location billing. NCA asserts that LABO, or a billing practice similar to LABO, is required of AT & T, but the language contained in the SDN tariffs appears not to require AT & T to bill NCA under LABO because NCA and its customers are not joined in a common business. Furthermore, the more general issue of whether AT & T discriminates against its reseller customers with its current billing practice affects what billing practice AT & T should employ regardless of the language contained in, or absent from, the SDN tariffs. *See* 47 U.S.C. § 202 (prohibiting unjust or unreasonable discrimination in the provision of communication service); *see also* 47 U.S.C. § 201 (prohibiting unjust or unreasonable provisioning of communication service).

Thus, resolving how AT & T should bill NCA requires a close study of SDN service. Neither the tariffs nor any cases cited by the parties to the Court sufficiently address the manner in which AT & T must bill NCA. In fact, when NCA's claims regarding AT & T's billing practice are viewed together with NCA's allegations that AT & T seeks to weaken the market share of its reseller customers, the entire basis of the relationship between AT & T and its reseller customers appears to

be called into question. The FCC clearly has better insight and expertise and is better equipped than this Court to fulfill that investigation, which will require the evaluation of extrinsic evidence and the establishment of policy in this area. *See United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *Towne Reader Service, Inc. v. MCI Telecommunications Corp.*, No. 91–CV–115S, 1992 WL 225550 (W.D.N.Y. August 11, 1992); *Erdman Technologies Corp. v. US Sprint Communications Co. L.P.*, No. 91 Civ. 7602 (PKL), 1992 WL 77540 (S.D.N.Y. April 9, 1992).

Here, the FCC's role is particularly central because resolving how AT & T must bill NCA calls into question the tariffs which FCC granted AT & T for SDN. In moving for relief as to AT & T's billing practice, NCA effectively points to lapses in the tariffs already promulgated by the FCC, insofar as the tariffs arguably allow AT & T to maintain an allegedly discriminatory and unreasonable billing practice. In this instance, the possibility of conflict between a ruling by this Court and the policies of the FCC exists and reference to the FCC in the first instance is appropriate. *See Danna v. Air France*, 463 F.2d 407 (2d Cir.1972); *Erdman Technologies, supra.*

For these reasons, "preliminary resort" to the FCC for consideration of how AT & T should bill NCA is appropriate. *Far East*, 342 U.S. at 574–75, 72 S.Ct. at 494. However, NCA has not yet initiated proceedings before the FCC, and the passage of time without resolution of the parties' dispute poses an extreme threat to NCA. Accordingly, I turn to the standards for issuance of a preliminary injunction in order to maintain the status quo between the parties pending a determination by the FCC. *Cf. MCI Communications Corp. v. American Tel. & Tel. Co.*, 496 F.2d 214 (3d Cir.1974) (vacating preliminary injunction granted while issues remained pending before FCC).

### III. *Preliminary Injunction*

■ The standard governing the issuance of a preliminary injunction is well settled. NCA must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [NCA]." *Jackson Dairy, Inc. v.*

*H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

### A. *Irreparable Harm*

NCA asserts that irreparable harm exists in the loss of its good will under AT & T's newly instituted billing practice. According to NCA, this billing practice injures its good will in two ways. First, NCA claims that its customers rely upon AT & T's issuance of bills as verification that their telecommunications service is in fact delivered by AT & T. Because NCA must issue bills to its customers in order to avoid the 120-day rule, NCA's customers lose confirmation of their link to AT & T. NCA asserts that its loss of good will in this manner is acute because NCA has represented to its customers in the past that AT & T would issue the bills. Second, NCA states that its customers accord greater legitimacy to the accuracy of their bills when the bills are issued by AT & T than if issued by anyone else. At present, the bills issued by NCA in fact are not as accurate as the bills which AT & T had issued to NCA's customers. As explained above, NCA lacks the ability to credit customers properly for payments they have made to AT & T.

NCA expects to lose many of its customers as a result of the new billing procedures; these customers will switch to a different long distance voice telecommunications service—possibly one operated by AT & T. NCA contends that it will be unable to determine exactly which customers discontinue telecommunications service through NCA as a result of the changed billing practice. Accordingly, NCA contends that an alternative basis for finding irreparable harm is an inability to calculate NCA's losses as monetary damages.

In response, AT & T contends that NCA's assertions of irreparable harm are inadequate because they are remote and speculative. In short, AT & T states that NCA has made no concrete showing that AT & T's billing practice will cost NCA any customers.

AT & T is correct that a preliminary injunction will not issue based upon remote or speculative fears. *USA Network v. Jones Intercable, Inc.*, 704 F.Supp. 488, 493 (S.D.N.Y.1989). In this case, however, I do not find NCA's claims of harm to be remote or speculative. NCA is effectively in the business of acting as an intermediary between its customers and AT & T. Because AT & T provides the actual tele-

communications service to NCA's customers, NCA's role is limited. NCA's customers expect NCA to provide them with timely and accurate billing, and little else rises to the same level of importance. NCA attracts customers primarily, if not solely, because NCA can provide them with access to SDN service. Billing, obviously, is where the advantage of that access lies.

For AT & T to claim that the danger to NCA is not concrete overlooks the reality of the situation. NCA's customers are no longer provided with the type of billing system which represents their fundamental motivation for engaging NCA—the receipt of timely and accurate bills from AT & T under SDN tariffs.[5] Without that fundamental service, NCA's customers will have no reason *not* to switch to another telecommunications service and every incentive to do so. The irreparable harm to NCA is then a threat to the very existence of its business. *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28–29 (2d Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

AT & T argues that even if NCA is harmed, NCA can be fully compensated by monetary damages. In this case, however, monetary damages cannot be calculated to a reasonable degree of certainty because there is no way in which to determine exactly which departed customers leave NCA because of the new billing procedure. *New York States Motor Truck Assoc., Inc. v. City of New York*, 654 F.Supp. 1521, 1540–41 (S.D.N.Y.), *aff'd*, 833 F.2d 430 (2d Cir. 1987). Furthermore, to the extent that NCA retains customers yet loses good will, damages cannot be reasonably measured. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n. 1 (5th Cir.1989).

### B. *Merits*

As noted above in connection with the doctrine of primary jurisdiction, the tariffs filed by AT & T regarding SDN service do not speak clearly to how AT & T must bill NCA and NCA's customers, and this matter should be referred to the FCC, which is better equipped than this Court to undertake the required investigation and analysis. Under these circumstances, I cannot state that plaintiff has demonstrated a likelihood of success on the merits.

However, I find that sufficiently serious questions exist in this dispute making them a fair ground for litigation; additionally, the balance of hardships clearly tips toward NCA.

The questions meriting considered litigation before the FCC revolve around the standards contained within the SDN tariffs regarding billing and the extent to which the standards apply, if at all, to NCA. Furthermore, whether or not the tariffs are found to deal with AT & T's billing of NCA and other reseller customers, the FCC will need to consider the reasonableness and potential discriminatory aspects of AT & T's newly instituted billing procedures in the context of the SDN tariffs and the Communications Act of 1934 in general.

Moreover, the balance of hardships tips decidedly in favor of NCA. As described already, AT & T's present billing practice compels NCA to bill its customers in order to avoid the potentially disastrous results of the 120–day rule. By billing its customers, NCA does not remedy the situation, however. NCA must undertake the very costly and time-consuming process of issuing bills and, because of the inadequate materials provided to it by AT & T, NCA cannot account properly in the bills for payments made to AT & T by its customers. As noted above, the present billing situation threatens NCA's very existence.

In contrast to NCA's hardship, AT & T must issue some kind of billing material under any scenario, *i.e.*, whether AT & T bills NCA's customers as it did prior to November 1992 or as it did beginning in November 1992, or whether AT & T provides NCA with materials to enable NCA to bills its own customers. In each situation, AT & T must process and disseminate billing information regarding NCA's customers. In fact, it is not clear that AT & T's pre–November 1992 billing practice was any more burdensome to it than its subsequent billing practice. The burden, whatever its extent, entailed in AT & T's pre–November 1992 billing practice apparently did not figure into AT & T's decision to change its billing practice.

### IV. *Conclusion*

For the reasons stated above, NCA's motion for a preliminary injunction is granted and it is hereby ordered that:

---

**5.** In support of its motion, NCA reports an astronomical increase in customer complaints related to billing following AT & T's initiation of

its new billing practice and NCA's attempted billing of the individual customers. Schoenberg Aff. ¶ 11.

1. AT & T discontinue with respect to NCA the changes made to its billing practice in November 1992, *i.e.,* AT & T shall return to its practice of billing NCA's customers without the 120–day rule including showing past due amounts from individual NCA customers as such. Keeping in mind the Court's intention to maintain the status quo as it existed prior to November 1992, the parties shall confer in good faith in order to re-establish the prior billing practice during the next billing cycle beginning after the issuance of this order, while minimalizing any confusion by NCA's customers and assuring that the bills issued to NCA's customers are accurate and do not reflect the past or present use of the 120–day rule.

2. Within two weeks of the issuance of this order, NCA shall seek a determination from the FCC as to the merits of its claims regarding the billing practice instituted by AT & T in November 1992. The parties shall advise the Court promptly of any order or other determination of the FCC with respect to NCA's claims.

3. NCA need not post security in conjunction with the preliminary injunction as the Court discerns minimal harm, if any, to AT & T resulting from its issuance. *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974).

4. On or before March 19, 1993, the parties shall each submit a letter to the Court stating their respective positions regarding the referral to the FCC, pursuant to the doctrine of primary jurisdiction, of the causes of action remaining in this action, *i.e.,* discrimination under the Communications Act of 1934, monopolization and attempted monopolization in violation of the Sherman Act, and violation of SDN tariffs and federal common law.

5. This action is stayed, except for the performance required by this order, pending further order of this Court.

SO ORDERED.

## MODIFICATION TO THE PRELIMINARY INJUNCTION ENTERED FEBRUARY 19, 1993

This matter having been opened to the Court by Pitney, Hardin, Kipp & Szuch, attorneys for defendant American Telephone and Telegraph Company, Inc. ("AT&T"), (Frederick L. Whitmer, Esq. appearing), and in the presence of Fabricant, Yeskoo & Colangelo, P.C., attorneys for plaintiff, National Communications Association, Inc. ("NCA"), (Richard C. Yeskoo, Esq. appearing), for an Order Reconsidering, Dissolving, or, alternatively, Staying the February 19, 1993 Preliminary Injunction, and for good cause shown;

IT IS on this 2nd day of April, 1993:

ORDERED that plaintiff NCA shall compile a list for presentation to AT&T of all its end users which remain active NCA customers, though delinquent in their account balances for SDN traffic; and it is

FURTHER ORDERED that plaintiff NCA will advise AT&T of the amount of all payment credits received from end users whose accounts were affected by the application of AT&T's policy change in November 1992 concerning receivables; and it is

FURTHER ORDERED that plaintiff NCA will bill its end users with delinquent balances for February and March traffic, except to the extent AT&T completes an adjustment pursuant to the Terms of this Order prior to March 31, 1993; and it is

FURTHER ORDERED that defendant AT&T shall discontinue with respect to NCA the changes made to its billing practice in November 1992, and shall reinstate the billing procedures it employed prior to November 1992 for April usage for those NCA customers identified pursuant to the first decretal paragraph of this Order and such bills shall not reflect any credits applied to those statements as a result of the billing procedure AT&T instigated in November 1992; and it is

FURTHER ORDERED that AT&T shall endeavor in good faith to adjust as many NCA end user accounts as possible between this date and April 30, 1993; and it is

FURTHER ORDERED that the parties shall advise the Court promptly of any order or other determination of the FCC with respect to NCA's claims made in its Complaint dated March 4, 1993; and it is

FURTHER ORDERED. that the date upon which the parties shall file statements of position regarding the remaining issues in this action and whether they should be transferred to the FCC under the primary jurisdiction doctrine shall be April 16, 1993; and it is

FURTHER ORDERED that NCA need not post security in conjunction with the preliminary injunction as the Court discerns minimal harm, if any, to AT&T resulting from its issuance. *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir.), *cert. denied*, 417 U.S. 932 (1974); and it is

FURTHER ORDERED that this action is stayed, except for such performance as is required of the parties by this Order, pending further order of this Court; and it is

FURTHER ORDERED that AT&T's Motion for Reconsideration, Dissolution, or, alternatively, Stay of the February 19, 1993 Preliminary Injunction is denied.