VOICESTREAM WIRELESS
CORP., Plaintiff,

v.

ALL U.S. COMMUNICATIONS
Defendant.

No. 01 CIV. 1856(SHS).

United States District Court,
S.D. New York.

May 22, 2001.

William M. Barron, Julian C. Swearengin, Alston & Bird, L.L.P., New York City, for Plaintiff.

Alfred R. Fabricant, Max Moskowitz, Lawrence C. Drucker, Ostrolenk, Faber, Gerb & Soffen, L.L.P., New York City, for Defendant.

## OPINION & ORDER

STEIN, District Judge.

Plaintiff VoiceStream Wireless Corporation has moved for an injunction pursuant to Fed.R.Civ.P. 65, seeking to prevent defendant All U.S. Communications, Inc. from (a) inducing VoiceStream's dealers to breach their VoiceStream Dealer Agreements by selling VoiceStream telephones to All U.S. and (b) repackaging, pre-activating, or otherwise altering and reselling VoiceStream products. VoiceStream alleges that All U.S. is tortiously interfering with VoiceStream's contracts with its dealers and is also violating Sections 32(1) and 43 of the Lanham Act, 15 U.S.C. § 1051 *et seq.*

In order to justify a preliminary injunction, the moving party must demonstrate (a) that it will suffer irreparable harm in the absence of the requested relief, and (b) either that (i) it "is likely to succeed on the merits," or (ii) "there are 'sufficiently serious questions going to the merits' and the 'balance of hardships tips decidedly' its way." *Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 853 (2d Cir.1996) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991)); *see also Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 6 (2d Cir.1996).

Based upon the pleadings, the parties' submissions, and the arguments made at the hearing held on April 4, 2001, the requested preliminary injunction is hereby denied because VoiceStream has not shown that it is likely to succeed on the merits of either the tortious interference

or Lanham Act claims. Moreover, VoiceStream has not demonstrated that it will be irreparably harmed in the absence of an injunction. Last, the balance of hardships favors All U.S., not VoiceStream.

**BACKGROUND**

VoiceStream, a provider of digital wireless communications, sells wireless telephones and air time to individual subscribers through a network of authorized dealers. In order to access VoiceStream's Global System for Mobile ("GSM") network, a customer must use a GSM telephone. A customer can purchase a GSM telephone from an authorized VoiceStream dealer along with a pre-paid, fixed amount of VoiceStream air time. The telephone must be activated by the customer prior to use. Upon activation, the customer has sixty days to use the pre-paid air time or the air time expires. If the customer fails to purchase additional air time within sixty days, VoiceStream discontinues the telephone's service. VoiceStream's dealer agreement prohibits its dealers from selling VoiceStream telephones to anyone other than individual subscribers or authorized subdealers, or activating telephones before they are sold to subscribers.

VoiceStream does not manufacture telephones itself, but rather obtains them from manufacturers. The telephones are co-branded, displaying the logos of both the telephone manufacturer and VoiceStream. VoiceStream sells the telephones in a box bearing the VoiceStream logo and information about the telephone. Inside the box, VoiceStream places additional material, including the VoiceStream "Customer Care" telephone number, VoiceStream warranty information, and a VoiceStream "Welcome Guide," that contains information about the telephone's operation, voice mail, and other features.

All U.S. is a New York corporation that commenced business in November, 2000.

All U.S. has openly professed its plan to sell customers pre-activated GSM telephones along with pre-paid air time. Between November, 2000 and February, 2001, All U.S. approached VoiceStream several times seeking to purchase GSM telephones with prepaid VoiceStream service directly from VoiceStream. VoiceStream rejected All U.S.'s proposals. All U.S. then approached VoiceStream dealers and successfully convinced them to activate and sell telephones to it. All U.S. repackages the telephones for resale by removing the outer box and VoiceStream documentation and placing an All U.S. label directly on the clear plastic inner case. All U.S. has expressed its willingness to modify its packaging in any way to reduce the possibility of confusion as to the source of the telephones. To that end, All U.S. has proposed a revised label stating that the telephone has been repackaged by All U.S., service is provided exclusively by VoiceStream, and All U.S. is unrelated to either the telephone manufacturer or VoiceStream. All U.S. has also agreed to obliterate the VoiceStream logo from the telephone itself if VoiceStream wishes. Additionally, while All U.S. has concededly placed erroneous expiration dates upon some of its packaging labels, All U.S. has represented that any errors have been unintentional and it will ensure that the correct expiration dates will be set forth on the label.

**DISCUSSION**

**I. VoiceStream Has Not Demonstrated a Likelihood of Success on the Merits.**

**A. VoiceStream Has Not Demonstrated a Likelihood of Success on the Merits of Its Tortious Interference with Contract Claim, but There Are Serious Questions Going to the Merits.**

To establish a claim of tortious interference with contract, New York law

"requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages." *Foster v. Churchill,* 87 N.Y.2d 744, 749–50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996). VoiceStream has not established that it is likely to succeed on the merits of this claim because there are serious issues going to whether the provision violated by VoiceStream's dealers is enforceable.

VoiceStream has shown that it is likely to succeed on the first two elements of its tortious interference claim: the existence of a valid contract and All U.S.'s knowledge of that contract. On its face, VoiceStream's dealer agreement bars VoiceStream's dealers from selling VoiceStream equipment to All U.S., as it states that a "[d]ealer shall only sell the Equipment provided by Company to its Sub–Dealers or Subscribers, and shall not sell . . . the Equipment . . . to any other person or entity." (Compl. Exh. 2 at ¶ 1.4.2.) It is also clear that All U.S. knew the contents of VoiceStream's Dealer Agreement. Not only did VoiceStream representatives explain to All U.S. in a meeting on February 1, 2001 that, in VoiceStream's view, All U.S.'s conduct caused a breach of the Dealer Agreements, but VoiceStream's counsel also provided All U.S. with notice of the agreement in a subsequent letter dated February 22, 2001. (Compl. ¶ 30 & Exh. 3, 5.)

■ However, there are serious questions going to the merits of whether All U.S. intentionally procured a breach of contract. All U.S. has openly set forth its intentions to induce VoiceStream dealers to activate telephones prior to end-consumer purchase. (Compl. ¶ 30 & Exhs. 4, 5.) Nonetheless, serious issues exist regarding whether VoiceStream's dealer re-sale restriction is enforceable pursuant to the Communications Act and FCC regulations. If the contractual restriction in the present case is not enforceable, a VoiceStream dealer's failure to observe the restriction does not constitute a breach. *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191–94, 406 N.E.2d 445, 449–51, 428 N.Y.S.2d 628, 633–34 (1980); *see also Savannah Bank, N.A. v. Savings Bank of the Fingerlakes,* 261 A.D.2d 917, 918, 691 N.Y.S.2d 227, 229 (4th Dep't 1999).

There are serious questions regarding whether the resale restriction in VoiceStream's dealer agreement constitutes an unreasonable restriction upon resale in derogation of the Communications Act of 1934. Section 202(a) of the Federal Communications Act provides as follows:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means . . . or to make or give any undue or unreasonable preference or advantage to any particular person [or] class of persons . . . or to subject any particular person [or] class of persons . . . to any undue or unreasonable prejudice or disadvantage.

*See* 47 U.S.C. § 202(a). A related regulation, 47 C.F.R. § 20.12(b), provides that a carrier "shall not restrict the resale of its services, unless the carrier demonstrates that the restriction is reasonable." Thus, the issue is whether the provision of the VoiceStream dealer agreement which prohibits third parties from obtaining and reselling VoiceStream's equipment and services is reasonable.

As an initial matter, VoiceStream contends that its dealer agreement does not constitute a restriction upon "resale,"

which is defined by the Federal Communications Commission ("FCC") as "an activity in which one entity (the reseller) subscribes to the communications services or facilities of a facilities-based provider and then reoffers communications services to the public (with or without 'adding value') for profit." *In the Matter of Interconnection and Resale Obligations Pertaining to Commercial Mobile Radio Svcs.*, 11 FCC Rcd 18455, 18457, 1996 WL 391284 (F.C.C. July 12, 1996). VoiceStream urges the Court to find that because VoiceStream's authorized dealers do not seek to subscribe to the services and then reoffer them to the public, VoiceStream's dealer contract does not prevent VoiceStream's dealers from "reselling" and thus does not constitute a restriction upon resale.

However, the FCC has set forth that while the resale rule "does not require providers to structure their operations or offerings in any particular way, such as to promote resale, or adopt wholesale/retail business structures ... no provider may *directly or indirectly* restrict resale in a manner that is unreasonable in light of the policies stated here ... an explicit ban on resale is unlawful, as are practices that effectively (i.e., indirectly) restrict resale, unless they are justified as reasonable." *Id.*, 11 FCC Rcd at 18465 (emphasis added). Pursuant to the *Matter of Interconnection* definition of resale, All U.S., not VoiceStream's authorized dealers, can be seen as the "reseller," as All U.S. seeks to subscribe to VoiceStream's communications services and then reoffer them to the public for profit. Therefore, there are serious questions regarding whether VoiceStream's dealer contracts constitute practices which effectively restrict resale by All U.S. or any other entity which seeks to resell VoiceStream's services.

Any restriction upon resale must be reasonable in light of FCC policies. *See Digi-*

*tal Communications Network, Inc. v. AT & T Wireless Svcs.*, 63 F.Supp.2d 1194, 1201 (C.D.Cal.1999). VoiceStream asserts that its restriction is reasonable because by wholly controlling its distribution network it can best maximize the value of its product to the consumer. All U.S. contends that VoiceStream's absolute prohibition on resale is unreasonable. At this juncture, the Court will defer from determining the issue of whether VoiceStream's dealer agreement restriction is reasonable or not because this issue may eventually be referred to the FCC for resolution.

■ The doctrine of primary jurisdiction urges the referral of "cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion [to those] agencies created by Congress for regulating the subject matter." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Primary jurisdiction is designed to minimize potential conflicts between a court and an administrative agency which may arise because of "the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court." *MCI Communications Corp. v. AT & T Co.*, 496 F.2d 214, 220 (3d Cir.1974). Referral is appropriate "even though the facts after they have been appraised by such specialized competence [will] serve as a premise for legal consequences to be judicially defined." *Far East Conference*, 342 U.S. at 574, 72 S.Ct. 492. By referring to administrative agencies matters that involve "technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise," preliminary referral secures "[u]niformity and consistency in the regulation of business." *MCI Communications*, 496 F.2d at 220; *Far East Confer-*

*ence*, 342 U.S. at 574–75, 72 S.Ct. 492; *see also Digital Communications Network*, 63 F.Supp.2d at 1201 (citing *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976)); *Richman Bros. Records v. U.S. Sprint*, 953 F.2d 1431, 1435 n. 3 (3d Cir.1991).

■ The issue of reasonableness is properly referred to the FCC where "the determinations presented require the FCC's expertise, skill, and ability to resolve the dispute." *See Digital Communications Network*, 63 F.Supp.2d at 1202. The FCC is the administrative agency charged with expert skill and knowledge within the telecommunications industry. "Referral ... to the FCC would thus secure 'uniformity and consistency in the regulation of business entrusted to the FCC' and would promote 'a uniform and expert administration of the regulatory scheme laid down by the Act.'" *AT & T Corp. v. Ameritech Corp.*, No. 98 Civ. 2993, 1998 WL 325242, at *3 (N.D.Ill. June 10, 1998) (quoting *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64–65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)) (internal brackets omitted); *Digital Communications Network, Inc. v. AB Cellular Holding LLC*, No. 99 Civ. 5418, 1999 WL 1044234 (C.D.Cal. Aug.19, 1999) (where the plaintiffs purchased and resold defendants' cellular telephone equipment and services, the reasonableness of the defendant's refusal to offer plaintiffs certain service plans was properly referred to the FCC); *see also, e.g., In the Matter of AT & T v. Ameritech and Qwest Communications*, 13 FCC Rcd. 14508, 1998 WL 347210 (F.C.C. June 30, 1998); *Unimat v. MCI*, No. 92 Civ. 5941, 1992 WL 391421 (E.D.Pa. Dec.16, 1992); *AT & T v. The People's Network*, 1993 WL 248165 (D.N.J.1993). "[R]endering a decision without the benefit of the FCC's interpretation of the term 'reasonable' would be counterproductive

and ultimately disservice those who have an interest (or a potential interest) in this dispute." *Digital Communications Network*, 63 F.Supp.2d at 1202 (citing *AT & T*, 1998 WL 325242, at *3).

Accordingly, the parties are hereby requested to address the issue of whether the reasonableness of VoiceStream's restriction should be referred the FCC. At this juncture, the Court cannot conclude that VoiceStream is likely to succeed on the merits of its tortious interference with contract claim, and the Court finds solely that sufficiently serious questions exist regarding whether All U.S. intentionally induced a breach of VoiceStream's contract with its dealers.

■ Regarding damages, the fourth element of a tortious interference claim, VoiceStream has only raised sufficiently serious questions and has not shown a likelihood of success. VoiceStream alleges that it suffered damages because its relationship with its dealers has been strained, it lost control of its distribution network and its ability to protect its goodwill, and it has incurred greater costs in policing the dealers. VoiceStream also claims that customers who buy All U.S. telephones are less likely to purchase additional VoiceStream air time due to their disappointment with their air time expiring before All U.S. advised them it would.

In response, All U.S. brands VoiceStream's damage claims as speculative, and urges that far from being damaged by All U.S.'s actions, VoiceStream is selling additional telephones and air time due to All U.S.'s purchases and resales. Neither side substantiates its damages claims at all. The Court is reluctant to infer pecuniary injury upon VoiceStream's initial minimal showing, *see, e.g., H.L. Hayden Co. v. Siemens Med. Sys.*, 879 F.2d 1005, 1024 (2d Cir.1989), but finds at this juncture that VoiceStream has presented facts raising

sufficiently serious questions regarding damage.

### B. VoiceStream Has Not Established a Likelihood of Success or Sufficiently Serious Questions Going to the Merits of Its Lanham Act Claims.

VoiceStream alleges that All U.S. "repackages and markets the phones in a manner that causes confusion as to the origin of the phones and that misleads consumers." (Compl.¶ 7.) Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), creates a federal private cause of action for injunctive relief and damages against a manufacturer who "uses in commerce any word, term, name, symbol, or device" or "any false designation of origin" that is "likely to cause confusion" or mistake or deception "as to the origin" of its product. An action for trademark infringement pursuant to Section 32(1) arises where "[a]ny person ... without the consent of the registrant ... use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... [and] such use is likely to cause confusion." 15 U.S.C. § 1114(1); *see also Warner–Lambert*, 86 F.3d 3.

 VoiceStream contends that All U.S. sells an inferior product to VoiceStream's telephones. The sale of goods bearing the owner's mark but that do not meet the trademark owner's quality control standards constitutes trademark infringement. *See Polymer Tech. Corp. v.*

*Mimran*, 37 F.3d 74, 78 (2d Cir.1994). VoiceStream states that because All U.S. removes VoiceStream documents that are contained in the package with the telephone and are crucial to a customer's use and enjoyment of the telephone, the repackaged VoiceStream telephones do not meet VoiceStream's quality control standards. Additionally, the complaint alleges that the telephones sold by All U.S. are inferior because All U.S. places erroneous expiration dates on the repackaged telephones' packaging, resulting in customers' air time expiring before the promised expiration date. (Compl. ¶ 36; Hayes Decl. ¶¶ 2–4; Hayes Supp. Decl. ¶¶ 3–4 & Exh. C.) The evidence has shown that although All U.S. sells the exact same physical product as VoiceStream, the absence of VoiceStream's packaging material and the product's reduced initial period of use has the potential to result in a product of lesser quality.

 However, VoiceStream has not shown that there is a likelihood of confusion resulting from All U.S.'s proposed packaging.[1] As a prerequisite to a finding of trademark infringement, the inferior goods sold must bear the owner's mark. *See Polymer*, 37 F.3d at 78; *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir.1986) (the Lanham Act protects the right to control the quality of the goods sold "under the holder's trademark"). While All U.S. supplies telephones that state on their face that they employ VoiceStream wireless service, All U.S. has agreed to obliterate the Voi-

---

1. While the Second Circuit has held that a court deciding whether a plaintiff has established likelihood of confusion must consider the eight factors elaborated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961), *see New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183 (2d Cir.2001), the facts of this case render the *Polaroid* test inapposite, and neither party has sought the application of the *Polaroid* test. The correct analysis is that found in *Warner–Lambert*, 86 F.3d 3, as this case involves the resale of VoiceStream's actual product rather than a misuse of its mark or trade dress in selling a product from an independent source.

ceStream logo from the telephone itself. (Bienenfeld Aff. ¶ 39.) Moreover, All U.S. has agreed to modify the packaging to reduce any possibility of confusion, and has proposed a revised label stating "[t]his is a repackaged [manufacturer's name] mobile phone. All U.S. Communications is the repacker. Service is provided exclusively by VoiceStream Wireless. All U.S. Communications is wholly unrelated to the original mobile phone manufacturer or VoiceStream Wireless." (Bienenfeld Aff. Exh. 7.) VoiceStream's argument that there is no possible packaging change which could remedy any risk of customer confusion is unavailing. VoiceStream has not shown that the removal of its logo, along with packaging modifications including specific disclaimers regarding the source of the product, would nonetheless result in a likelihood of confusion. All U.S.'s proposed repackaging and removal of the VoiceStream mark—if that is what plaintiff prefers—sufficiently reduce the likelihood of customer confusion. *See, e.g., Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924).

■■■ VoiceStream's argument that All U.S. is "passing off" VoiceStream's service as its own pursuant to 15 U.S.C. § 1125(a)(1) is also unpersuasive. *See id.* All U.S.'s proposed label explicitly states that "[t]his is a repackaged [manufacturer's name] mobile phone. All U.S. Communications is the repacker. Service is provided exclusively by VoiceStream Wireless [and] All U.S. Communications is wholly unrelated to . . . VoiceStream Wireless." (Bienenfeld Aff. Exh. 7.) These statements truthfully describe the product sold and the parties' relationship. Accordingly, VoiceStream has failed to establish a likelihood of success or sufficiently serious questions going to the merits of its Lanham Act claims.

## II. VoiceStream Has Not Established That Irreparable Harm Will Result in the Absence of the Injunction.

■■■ VoiceStream claims that All U.S.'s sale of an inferior, non-genuine product bearing the VoiceStream trademark will lead to a loss of customer goodwill that cannot be measured or remedied by money damages and therefore constitutes irreparable harm. *See John Paul Mitchell Sys. v. Quality King Distribs., Inc.,* 106 F.Supp.2d 462, 473 (S.D.N.Y. 2000). VoiceStream also correctly notes that in the trademark infringement context, a showing of likelihood of confusion establishes irreparable harm. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988); *Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 78 (2d Cir.1994). However, as shown above, VoiceStream has made no showing of a likelihood of consumer confusion, and All U.S. has agreed to further alter its packaging to attempt to avoid consumer confusion and its attendant loss of goodwill by VoiceStream. VoiceStream's speculative claim that customers who buy the VoiceStream product from All U.S. rather than an authorized VoiceStream dealer will be less satisfied and less likely to renew their VoiceStream service has no foundation in the record beyond speculation. A "preliminary injunction will not issue based upon remote or speculative fears." *See National Communications Assoc. v. AT & T Co.,* 813 F.Supp. 259, 264 (S.D.N.Y.1993).

■■■ VoiceStream also contends that it will be irreparably harmed if the injunction is not issued because it will be forced to continue investigating and suing its authorized dealers for breach of contract. However, VoiceStream's costs of investigation and bringing suit, if it decides it must do so in order to enforce the terms of its dealer contracts, can be determinably calculated and reimbursed. *See John Paul*

*Mitchell Sys.*, 106 F.Supp.2d at 475 (declining to grant a preliminary injunction because any damages to plaintiff's distribution scheme were compensable). Therefore, VoiceStream has not established irreparable harm.

### III. Alternatively, the Balance of Hardships Weighs in Favor of All U.S.

 Assuming sufficiently serious questions going to the merits of VoiceStream's tortious interference claim, the balance of hardships nonetheless weighs in favor of All U.S. VoiceStream's potential hardship consists of the possibility that it will suffer such monetary damage as the cost of investigating and litigating against any of its dealers who sell product to All U.S. However, the preliminary injunction sought by VoiceStream, if issued, "would cause All U.S. to cease operations." (Bienenfeld Aff. ¶ 47.) All U.S.'s General Manager has specifically averred that the injunction "will effectively put All U.S. out of business." (Bienenfeld Aff. ¶ 7.) Accordingly, the balance of hardships weighs decidedly in favor of All U.S.

### CONCLUSION

For the reasons stated above, VoiceStream's motion for a preliminary injunction is denied. However, it is hereby ordered that within two weeks of this order, All U.S. shall modify the product and packaging of every telephone it purchases from an authorized VoiceStream dealer by (a) obliterating the "VoiceStream" logo from all telephones (assuming VoiceStream prefers that be done), (b) placing the revised packaging label as shown in Exhibit 7 to the Bienenfeld Affidavit on the outer package of all VoiceStream product it purchases, and (c) printing the correct service activation and expiration dates upon the packaging label. Moreover, within two weeks of this order, the parties shall sub-

mit to the Court memoranda regarding whether the reasonableness of VoiceStream's restriction on resale should be referred to the FCC for determination.

SO ORDERED.