**NATIONAL COMMUNICATIONS ASSOCIATION, INC.,**
**Plaintiff–Appellant,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY,**
**Defendant–Appellee.**

No. 357, Docket 94–7352.

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1994.

Decided Jan. 30, 1995.

Richard C. Yeskoo, New York City (Thomas T. Tamlyn, Jr., Fabricant, Yeskoo, & Co-langelo, P.C., of counsel), for plaintiff-appellant.

Frederick L. Whitmer, Morristown, NJ (Thomas F. Tamlyn, Jr., Pitney, Hardin, Kipp & Szuch; Ivan J. Kaplan), for defendant-appellee.

Before: FEINBERG, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

## BACKGROUND

Since 1990 plaintiff-appellant National Communications Association ("NCA") has engaged in the business of purchasing long distance telecommunications services from defendant-appellee American Telephone and Telegraph Company ("AT & T"), under AT & T's software defined network ("SDN") tariff, for resell to NCA's own customers. In the industry, NCA is called a reseller—one who engages in the business of purchasing long-distance telecommunication services at large-volume rates from a supplier, such as AT & T, and resells those services to others whose volume of use individually would not qualify them to purchase directly from the supplier.

In 1992 Tel–Save, Inc., a Pennsylvania telecommunications reseller, negotiated with AT & T for a contract tariff covering a special type of SDN service that granted to Tel–Save substantial discounts and services that were not available through AT & T's normal SDN tariff, FCC Tariff No. 1, § 6. In November 1992 AT & T filed the Tel–Save agreement with the Federal Communications Commission ("FCC") as Contract Tariff No. 54. As required by law, the filing offered to other customers the same favorable contract tariff terms, but their availability was limited to those who ordered the service within 90 days after the effective date of the contract tariff and, in addition, an applicant who did not qualify under its payment-history conditions would have to make an advance payment of $640,000 plus a deposit of twice that amount.

NCA timely applied for the lower rates under Contract Tariff No. 54, contending it had complied with all conditions and was not required to make either a deposit or advance payment. AT & T, however, denied NCA's

application, asserting that under Section 6.I. of Contract Tariff No. 54, NCA was ineligible for the lower-rate services without the advance payment and deposit.

Section 6.I. provided:

Deposit/Advance Payment—No deposit will be due if the Customer (1) has during the immediately preceding calendar year, no history of late payments with AT & T for usage from AT & T Tariff F.C.C. No. 1 of at least 5,000,000 minutes per month and (2) is current, at the time of ordering this Contract Tariff, in its payment to AT & T for any other AT & T Tariff F.C.C. No. 1 service. If the customer does not meet each criterion, the following will be required:

    i) An advance payment of $640,000;

    ii) A deposit of $1,280,000; and

    iii) Payment of all outstanding amounts due AT & T for any AT & T Tariff F.C.C. No. 1 services.

AT & T later waived the advance payment but still insisted on the deposit. When NCA refused to make the deposit, AT & T rejected NCA's application.

NCA then brought this suit against AT & T under the Federal Communications Act of 1934, 47 U.S.C. § 151 et seq. (1988), alleging that, in denying NCA telecommunication services under Contract Tariff No. 54., AT & T had engaged in unreasonable practices in violation of id. §§ 201(a) and (b) and unlawful discrimination in violation of id. § 202. NCA sought ten million dollars in damages, an injunction granting retroactive Contract Tariff No. 54 services to NCA, and attorneys' fees. AT & T did not answer the complaint, but instead moved to refer this case to the FCC under the doctrine of primary jurisdiction and to dismiss or stay the action while the dispute was being heard by the FCC.

The district court granted the motion and dismissed the complaint. In concluding that the FCC had primary jurisdiction, the district court focused on four factors as set out in a related case:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

District Court Opinion at 4 (citing *National Communications Ass'n v. AT & T*, 813 F.Supp. 259, 263 (S.D.N.Y.1993)).

The district court found that two of the four factors did not favor referral to the FCC. The court recognized that the issues presented in this case are not within the FCC's discretion (Factor 2) and that no prior application had been made to the FCC (Factor 4). However, because "the validity of a billing practice is at issue," the district court found referral to the FCC necessary based upon the need for agency expertise (Factor 1) and a danger of inconsistent rulings (Factor 3). Thus, the district court invoked the doctrine of primary jurisdiction and dismissed the complaint. NCA appeals. We reverse.

## DISCUSSION

■   Although sometimes framed in terms of whether the district court abused its discretion, *see, e.g., Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848, 854 (2d Cir.1988) (district court "applied an incorrect legal standard and thereby exceeded [its] discretion"), the standard of review is essentially *de novo*. "[W]e examine the factors upon which the existence of the doctrine rests to determine whether deferral is appropriate." *General Electric Co. v. MV Nedlloyd*, 817 F.2d 1022, 1026 (2d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988); *see also American Trucking Associations v. ICC*, 682 F.2d 487, 492 (5th Cir.1982) ("[W]e carefully examine the question presented to us to determine whether the rationale underlying primary jurisdiction applies and whether further determination by the agency will illuminate those issues before us.")

■   The doctrine of primary jurisdiction allows a federal court to refer a matter ex-

tending beyond the "conventional experiences of judges" or "falling within the realm of administrative discretion" to an administrative agency with more specialized experience, expertise, and insight. *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). Specifically, courts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency. *Goya*, 846 F.2d at 851.

■ No fixed formula has been established for determining whether an agency has primary jurisdiction. *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 65, 77 S.Ct. 161, 165–66, 1 L.Ed.2d 126 (1956). However, the four factors identified by the district court have generally been the focus of the analysis. *See Nader v. Allegheny Airlines Inc.*, 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *Far East Conference*, 342 U.S. at 574, 72 S.Ct. at 494; *MCI Communications Corp. v. AT & T*, 496 F.2d 214, 223 (3d Cir.1974); *NCA v. AT & T*, 813 F.Supp. at 263; *RCA Global Communications, Inc. v. Western Union Telegraph Co.*, 521 F.Supp. 998, 1006 (S.D.N.Y.1981). The court must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings. *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 321, 93 S.Ct. 573, 590, 34 L.Ed.2d 525 (1973).

■ We disagree with the district court's analysis. In our view, (a) there are no technical or policy issues presented that require agency expertise; (b) there is no risk of inconsistent interpretations; and (c) the fair administration of justice weighs substantially against referral.

A. *No Technical or Policy Issues are Present.*

■ This record does not present any issues involving intricate interpretations or applications of tariffs that might need the FCC's technical or policy expertise. Primary jurisdiction does not extend to a legal question that "is within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be

helpful in the application of these standards to the facts of the particular case." *Goya*, 846 F.2d at 848 (internal quotes omitted). This Court has held that primary jurisdiction does not apply to cases involving the enforcement of a tariff, as opposed to a challenge to the reasonableness of a tariff. *See C.A.B. v. Aeromatic Travel Corp.*, 489 F.2d 251, 253 (2d Cir.1973); *see also Danna v. Air France*, 463 F.2d 407, 410 (2d Cir.1972). Statutory reasonableness of a tariff should, of course, be reviewed by an agency because it is an "abstract quality represented by an area rather than a pinpoint." *Danna*, 463 F.2d at 410.

This case, however, does not involve the statutory reasonableness of the tariff or other abstract concepts. Instead, it focuses on a threshold question: whether at the time NCA applied, it qualified for Contract Tariff No. 54. That, in turn, depends on a rather simple factual question: whether NCA had timely paid its bills. This issue could easily be resolved by a district court in a reasonable amount of time. It does not require the FCC's policy expertise, or its specialized knowledge, and it is within the district court's experience. *See Nader*, 426 U.S. at 304–06, 96 S.Ct. at 1987–88.

In its legal arguments AT & T vaguely refers to issues that are "delicate" and "complex" and that present "a strong likelihood of inconsistency of interpretation and enforcement." However, it never creates any specific issues because AT & T never filed an answer to the complaint. To determine what issues are in an action, we look to the pleadings and the motion papers. Before us are the complaint and a notice of motion to refer the case to the FCC. AT & T filed no answer; the original motion was supported only by a memorandum of law; and there was no supporting affidavit. The complaint asserts that NCA timely applied for Contract Tariff No. 54, that it had no history of late payment with AT & T for the previous year, and that at the time of its application it was current on its payment to AT & T for other tariffed services.

AT & T does support in its brief to this court that there are issues as to "[h]ow NCA

was billed, and whether and to what extent NCA was responsible under AT & T Tariff FCC No. 1 for the amounts not paid AT & T by NCA's endusers [*sic*];" but AT & T's conclusory affidavit in reply to NCA's affidavits with the attached copies of the AT & T bills falls far short of placing the parties at issue over these points. On its motion to refer, AT & T's position amounted initially to a general assertion that this was a tariff matter and therefore should be heard by the FCC. NCA opposed the motion, however, arguing that the only issue was whether NCA had been in default on its payments to AT & T. In support of its position, NCA submitted an affidavit showing that on the monthly bills sent by AT & T to NCA for the period January 1992 to June 1993 there were substantial credit balances shown in favor of NCA. Copies of the bills were attached to the affidavit. In addition the affidavit stated:

> AT & T manages NCA's account in such a way that it always has a credit balance. AT & T has never sent NCA a bill for an amount due and owing on NCA's SDN. AT & T has refused to explain to NCA how its account has allegedly been paid late.

AT & T replied with a single, two-page affidavit. It did not explain why it had repeatedly sent NCA bills showing credit balances ranging from $400,476.88 to $1,098,127.64; it did not claim that it had ever sent NCA a bill for an amount due and owing; it did not even assert that NCA had a history of late payments. All it did was present, without explanation, a summary chart that purported to show, month by month, "NCA's outstanding balances due AT & T."

AT & T could have offered an explanation for the obvious discrepancy between its own bills to NCA sent in the regular course of business and the summary chart it prepared for this litigation, but it chose not to do so. More is required to trigger the doctrine of primary jurisdiction and remove from a district court a matter that congress has expressly authorized it to hear. *See* 47 U.S.C. § 207 (1988).

The district court relied strongly on *Allnet Communication Serv. Inc. v. National Exchange Carrier Ass'n*, 965 F.2d 1118 (D.C.Cir.1992), for the proposition that "billing disputes" in actions "involving tariff interpretations" should be directed to the FCC. That case involved a dispute between Allnet and the National Exchange Carrier Association ("NECA"), an entity specially formed by the FCC to perform services on behalf of 1200 local exchange carriers. The dispute was over four months of charges that Allnet refused to pay because they had not been published as valid common carrier tariffs as required under the Communication Act. The court held that the FCC had primary jurisdiction because NECA was an entity specially formed by the FCC and because the dispute involved technical questions on the adequacy of the necessary language to be included in tariff filings made by NECA under the FCC's direction.

Of course, neither AT & T nor NCA is an entity specially formed by the FCC, and there are no issues here over the adequacy of language in tariff filings. Determining whether NCA paid its bills on time, and calculating the damages from not receiving Contract Tariff No. 54 services, are not technical issues. They arise out of a single event based on a special arrangement between AT & T and NCA and they present questions that fall well within a district court's experience. Thus, they do not implicate the general application of a tariff, and or referral based on *Allnet* would be inappropriate.

B. *No Risk of Substantial Inconsistent Interpretations.*

NCA argues that the district court erred in concluding that referral to the FCC was essential to secure uniformity in the FCC's regulation of telecommunications. In this connection, the district court relied on *Allnet's* statement that: "[g]iven the concern for uniformity and expert judgment, it is hardly surprising that courts have frequently invoked primary jurisdiction in cases involving tariff interpretations." *Allnet*, 965 F.2d at 1120. However, as discussed above, this case does not require interpretation of Contract Tariff No. 54. The qualifying language of § 6.I, which sets forth the conditions for the deposit and advance payment, is clear. The focus of this action will be on AT & T's bills

and NCA's payment history over a 12–month period. This presents a unique and narrow factual dispute that poses no risk of inconsistent interpretations of Contract Tariff No. 54, particularly since NCA is the only reseller that applied for the benefit of the tariff.

C. *Administration of Justice Weighs Against Referral.*

NCA argues that the district court failed to recognize the need to resolve this dispute as quickly and fairly as possible, and it claims that the imposition of additional costs and delay would be critical in this case. Tel–Save is a major competitor of NCA in the reseller business, and without the favorable rates of Contract Tariff No. 54 that AT & T has granted to Tel–Save, NCA will be significantly harmed in the market.

"Agency decisionmaking often takes a long time" and the delay "imposes enormous costs on individuals, society, and the legal system." 2 KENNETH C. DAVIS ET AL., Administrative Law Treatise § 12.1, at 211 (3d ed. 1994). Delay in agency decisionmaking is often due to: "(1) large workload; (2) difficult issues; (3) inadequate funding and staffing; (4) poor organizational structure and management; (5) time-consuming decisionmaking procedures; (6) judicial review; (7) OMB review [by the president's office of management and budget]; and (8) intentional delay." *Id.* § 12.2, at 214.

At oral argument the parties estimated that the delay resulting from referring this case to the FCC would be from two to five years. Since the district court can conclude this matter far more expeditiously, a potential delay of even two years more than outweighs any benefit that might be achieved by having the FCC resolve this relatively simple factual dispute.

### CONCLUSION

The judgment of the district court is reversed, and the case is remanded for further proceedings.