UNITED STATES of America, Plaintiff,

v.

SANTA YNEZ BAND OF CHUMASH MISSION INDIANS OF THE SANTA YNEZ RESERVATION, CALIFORNIA; Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California; Cabazon Band of Cahuilla Mission Indians of the Cabazon Reservation, California; Cahuilla Band of Mission Indians of the Cahuilla Reservation, California; Morongo Band of Cahuilla Mission Indians of the Morongo Reservation, California; Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California; San Manuel Band of Serrano Mission Indians of the San Manuel Reservation, California; Soboba Band of Luiseno Mission Indians of the Soboba Reservation, California; Twenty–Nine Palms Band of Luiseno Mission Indians of California, Defendants.

No. CV–97–1716–JSL (Ex).

United States District Court,
C.D. California,
Western Division.

Oct. 13, 1998.

Assistant U.S. Atty., Eliot F. Krieger, Los Angeles, CA, for plaintiffs.

Santa Ynez Band of Chumash Mission Indians, Glenn M. Feldman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ, for Defendant.

Agua Caliente Band of Cahuilla Indians, Art Bunce, Law Offices of Art Bunce, Escondido, CA, for Defendant.

Cabazon Band of Cahuilla Mission Indians, Glen M. Felman, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ, for Defendant.

Cahilla Band Missions Indians, Eugene R. Madrigal, Law Offices, Temecula, CA, for Defendant.

Morongo Band of Cahuilla Mission Indians, George Forman, Forman & Prochaska, San Rafael, CA, for Defendant.

Pechanga Band of Luiseno Mission Indians, Jerome L. Levine, Levine & Associates, Los Angeles, CA, for Defendant.

San Manuel Band of Serrano Mission Indians, Jerome L. Levine, Levine & Associates, Los Angeles, CA, for Defendant.

Soboba Band of Luiseno Mission Indians, George Forman, Forman & Prochaska, San Rafael, CA, for Defendant.

Twenty–Nine Palms Band of Luiseno Mission Indians, William S. Davis, Arter & Hadden, Los Angeles, CA, for Defendant.

## JUDGMENT AND PERMANENT INJUNCTION

LETTS, District Judge.

The motion for a permanent injunction of plaintiff United States of America came on for hearing on July 20, 1998 and September 15, 1998. The court has reviewed all the papers filed in connection with this matter, has heard oral argument, and is fully apprised of the relevant facts and law.

In 1994, the Ninth Circuit held that the State of California has no obligation to negotiate about gaming activities that are forbidden to all others in the State. *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250 (9th Cir.1994), *cert. denied sub nom., Sycuan Band of Mission Indians v. Wilson*, — U.S. ——, 117 S.Ct. 2508, 138 L.Ed.2d 1012 (1997). After affirming the district court's holding that the State did not need to negotiate over banked or percentage card games with traditional casino themes, the Ninth Circuit remanded to the district court "the limited question of whether California permits the operation of slot machines in the form of the state lottery or otherwise." *Id.* at 1260.

On September 16, 1998, the *Rumsey* district court issued its opinion on remand. ("*Rumsey II.*") The district court held that "[t]here is no question that California generally prohibits 'every person' from operating slot machines as a misdemeanor offense," *id.* at 6, and that the California Lottery Act does not authorize the use of any other form of gaming activities except lottery games. *Rumsey II* at 11.

Based on the holdings in the Ninth Circuit's *Rumsey* opinion and *Rumsey II*, the uncompacted Class III gaming currently being conducted by defendants is illegal in California and, therefore, is uncompactable. This court concurs with the finding in *Rumsey II* that "[s]ince the State is willing to negotiate with the Tribes with respect to games the C[alifornia] S[tate] L[ottery] is presently operating, it has satisfied the requirements of IGRA." *Id.* at 16. The State of California is under no obligation to negotiate with the defendant Tribes regarding illegal slot machines and other forms of uncompactable Class III gaming and, therefore, the State is not acting in bad faith.

Even if this court were to determine that at some past time the State had refused in bad faith to negotiate toward a tribal-state compact, the injunction would have to be granted. IGRA unambiguously provides that one year after the date of its enactment, all tribal Class III gaming conducted in the absence of a tribal-state compact is illegal. 25 U.S.C. § 2702(7)(D). IGRA contains no suggestion whatsoever that there could be factual circumstances that warrant an exception to this flat prohibition.

864

The Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), raised serious questions as to whether IGRA could be construed so as to allow it to survive. Several courts, including this one, suggested, perhaps improvidently, that IGRA might survive if refusal by the State to negotiate toward a tribal-state compact in good faith were deemed to constitute a defense to an equitable action to enjoin tribal Class III gaming. *United States v. Spokane*, 139 F.3d 1297, 1301 (9th Cir.1998), *United States v. Santa Ynez Band of Chumash Mission Indians*, 983 F.Supp. 1317 (C.D.Cal.1997). No court ever suggested, however, that this possible defense could somehow turn into a license for tribal gaming which could survive even after the state came into compliance with its IGRA obligations. In light of the *Rumsey* decisions, the court finds that the State is now in compliance with its IGRA obligations and that, therefore, the Indians must cease all uncompacted Class III gaming.

So as to present as complete a record as possible for any potential appeal, the court has examined the history of negotiations toward a tribal-state compact and has concluded that the State's actions were not in bad faith.

IGRA provides that the State "shall negotiate with the Indian tribe in good faith to enter into [a tribal-state] compact." 25 U.S.C. § 2710(d)(3)(A). The qualification to this good faith negotiation requirement is that proposed gaming activities must be negotiated by the state "only if such activities are ... located in a State that permits such gaming for any purpose by any person, organization, or entity...." 25 U.S.C. § 2710(d)(1)(B). Inherent difficulties arise when, as here, there are disputes about the kinds of Class III gaming permitted by the state. Under such circumstances, tribes can be expected to insist, in entirely good faith, that gaming that they believe others in the State are being permitted to conduct also be permitted to them by the tribal-state compact. As to those games that the State disputes that others are being permitted to conduct, the State can be expected to refuse, in entirely good faith, to include those games in the tribal-state compact.

■ The court finds that the negotiations toward tribal-state compacts with most of the defendant Tribes commenced as early as 1991 and continued in complete good faith from both sides until approximately 1992, when the course of negotiations made clear that the parties would be unable to agree on what kinds of gaming should be included in the tribal-state compacts until after legal disputes concerning what kinds of gaming was being permitted to others had been resolved. In order to further the negotiating process, the State and many of the defendant Tribes entered into a Litigation Agreement, pursuant to which the *Rumsey* case was filed. For purposes of that case, the State solved the *Seminole* problem by waiving any claim of sovereign immunity.

The Litigation Agreement apparently was performed by both sides in good faith until the district court's first decision in *Rumsey*. ("*Rumsey I.*") As contemplated by the Litigation Agreement, this decision, which upheld the Tribes' right to have the state negotiate the tribal-state compacts in accordance with the contentions of the Indian Tribes on all contested points, was appealed by the State. Rather than wait for the outcome of the appeal, many of the defendant Tribes commenced Class III gaming before negotiations had produced tribal-state compacts. The State thereupon refused to negotiate further with those tribes until they had discontinued all Class III gaming.

The Tribes have argued in this proceeding that this refusal was bad faith *per se*, and that, by reason thereof, the United States was not entitled to the relief sought. If the Litigation Agreement did or could have contemplated that the tribes would commence Class III gaming upon receiving favorable determinations at the district court level, this contention might have colorable merit. But the Litigation Agreement provides no such thing. What the Litigation Agreement does provide is that upon the issuance of district court rulings favorable to the defendant Tribes with respect to particular forms of gaming, the State could appeal such rulings. Negotiations would recommence and would

include the forms of gaming at issue on appeal. The negotiations would proceed to conclusion, subject to the right of the State to delay execution of the resulting tribal-state compacts pending the outcome of any appeal.

The Litigation Agreement does not contemplate, as the Tribes seem to contend, that if the district court was affirmed on appeal, the execution of the tribal-state compact would be a mere formality which would allow the Tribes to continue to do what they already had commenced to do. Nor does the Litigation Agreement contemplate that if the district court was reversed on appeal, so that a tribal-state compact along the lines previously drafted would never be executed, the State would be left to pursue whatever remedies it may have against existing unlawful gaming. The Tribes' decision to commence Class III gaming prior to the resolution of the *Rumsey* case and without a compact was not supported by any color of law, was contrary to the purpose of the Litigation Agreement, and sharply altered the negotiating environment. In these circumstances, it was entirely reasonable for the State to refuse to continue negotiations, and was not in bad faith.

IGRA provides no basis for any claim of right by the Tribes that they are entitled to conduct Class III gaming in the absence of a tribal-state compact. On the contrary, IGRA expressly prohibits any such gaming as a matter of federal law. This federal prohibition is not something that the state and the Tribes are free to bargain away by contract between them. Even if IGRA were interpreted to allow the Tribes to use the State's alleged bad faith as a defense to a judicial injunction against uncompacted Class III gaming (or comparable relief), and even if such an inquiry is still relevant after the *Rumsey* decisions, the record is entirely bereft of any indication that the State has not proceeded in entirely good faith throughout the history of these negotiations.

There being no ground upon which to hold that the State has refused to negotiate in good faith as to the kinds of gaming left open to the defendant Tribes after the *Rumsey* decisions, the injunction must be granted.

## ORDER

Having reviewed the papers filed in connection with this matter, having heard oral argument, and being fully apprised of the relevant facts and law,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

A. The defendants Santa Ynez Band of Chumash Mission Indians; Agua Caliente Band of Cahuilla Indians; Cabazon Band of Cahuilla Mission Indians; Cahuilla Band of Mission Indians; the Morongo Band of Cahuilla Mission Indians; Pechanga Band of Luiseno Mission Indians; San Manuel Band of Serrano Mission Indians; Soboba Band of Luiseno Mission Indians; and Twenty–Nine Palms Band of Luiseno Mission Indians ("defendants") are conducting Class III gaming activities without a tribal-state compact and are in violation of the terms of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721;

B. The defendants and their tribal chairpersons, tribal council members, directors, officers, agents, employees and all persons associated with and/or acting in concert with the defendants, are enjoined, restrained and prohibited from initiating, operating, engaging in, offering, conducting, licensing, or otherwise permitting any game of chance that is defined as Class III gaming by IGRA, 25 U.S.C. §§ 2701–2721, including but not limited to all electronic and video games of chance, in operation at their casinos.

C. Each defendant Tribe must choose one of the following two options by which they will cease the above-referenced gaming:

**Option One:** Defendants are ordered to terminate the above-referenced gaming in the following manner:

1. No later than the close of business on the fifth (5th) day after entry of this order, each defendant Tribe will serve upon the United States Attorney's Office a complete inventory of all Class III gaming devices, including

but not limited to video gambling machines, at any casino owned, operated or controlled by defendant Tribes. This inventory will include a description of each device, including manufacturer, model and serial number.

2. No later than midnight on Friday, October 23, 1998, each defendant Tribe will shut down, disable or remove 25% of its uncompacted Class III gaming.

3. Each defendant Tribe will shut down an additional 25% (of the initial number of machines) of its uncompacted Class III gaming no later than midnight on the following days: October 30, November 13, 1998 and November 20, 1998. After midnight on November 20, 1998, no defendant Tribe will operate any uncompacted Class III gaming.

4. No later than the close of business on the Monday following each day of the phased shut-down, each defendant Tribe will serve upon the United States and file with the Court a certification listing the manufacturer, model and serial number of each gaming device, including but not limited to video gambling machines, that has been shut down, disabled or removed. This certification will be signed by the Tribal Chairperson under penalty of perjury. The final certification, to be served and filed on November 23, 1998, will also state that the Tribe no longer operates any Class III gaming of any kind.

5. The defendant Tribes will allow, without interference of any kind, federal officers, including but not limited to FBI agents, to verify that the Tribes are complying with this Court order.

**Option Two:** Defendants are ordered to terminate the above-referenced gaming in the following manner:

1. By the close of business on the fifth (5th) day after entry of this order, each defendant Tribe will serve upon the United States Attorney's Office a complete inventory of all Class III gaming devices, including but not limited to video gambling machines, at any casino owned, operated or controlled by defendant Tribes. This inventory will include a description of each device, including manufacturer, model and serial number.

2. No later than midnight on Friday, December 4, 1998, each defendant Tribe will shut down, disable or remove all of its uncompacted Class III gaming *if* each defendant Tribe does not layoff any of its current employees prior to the last day of uncompacted Class III gaming operations.

4. By the close of business on Monday December 7, 1998, each defendant Tribe will serve upon the United States and file with the Court, a certification listing the manufacturer, model and serial number of each gaming device, including but not limited to video gambling machines, that has been shut down, disabled or removed. This certification will be signed by the Tribal Chairperson under penalty of perjury. This certification will also state that the Tribe no longer operates any Class III gaming of any kind.

5. The defendant Tribes will allow, without interference of any kind, federal officers, including but not limited to FBI agents, to verify that the Tribes are complying with this Court order.

Defendants must notify the court within five days of the date of this order which of the above two options it has chosen, along with its inventory of all Class III gaming devices.