The State of NEW YORK, and George E. Pataki, as Governor of the State of New York, Plaintiffs,

v.

The ONEIDA INDIAN NATION OF NEW YORK, Defendant.

No. 95–CV–554 (TJM).

United States District Court, N.D. New York.

Dec. 22, 1999.

Dennis C. Vacco, Attorney General of the State of New York, Albany, NY (Howard Zwickel, AAG., of Counsel) for Plaintiffs.

Zuckerman, Spaeder, Goldstein, Taylor & Kolker, LLP, Washington, D.C. (Joshua Levy, of Counsel), for Defendant.

Duker & Barrett, Albany, NY (George Carpinello, of Counsel), for Defendant— Local Counsel.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

### A. Facts

This action concerns whether the Turning Stone Casino's offering of a new game called Instant Multi–Game ("Multi–Game")[1] violates the Compact executed between Plaintiff, the State of New York (the "State"), and Defendant the Oneida Indian Nation of New York (the "Nation").

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("IGRA"), was passed by Congress in 1988, among other reasons, "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." *See* 25 U.S.C. § 2702(1). The IGRA divides gambling into three classes that correspond with different levels of state regulation. Class I gaming includes social games for nominal prizes. 25 U.S.C. § 2703(6). This class of gaming is within the exclusive control of the tribes and is exempt from state control and IGRA regulations or prohibitions. Class II gaming is more explicitly defined as including bingo, cards and lotto. A

---

**1.** The New York Times has described Multi–Game as a "slotless slot machine." The Turning Stone website describes the game as follows: "Instant Multi Game Machines offer quick, easy, cashless video gaming. Just pick your spot, choose your machine, insert your Turning Stone Diamond Card, activate the machine and go for it! Progressive payoffs, jackpot winnings for each game and more than 35 jackpot winners each and every week."

tribe may engage in, or license and regulate, Class II gaming on Indian lands so long as "such Indian gaming" is located within a State that permits such gaming, such gaming is not prohibited by federal law, and the governing body of the Indian tribe adopts an ordinance or resolution that is approved by the Chairman of the National Indian Gaming Commission. *See* 25 U.S.C. § 2710(b)(1).

Class III gaming is defined under IGRA as simply "all forms of gaming that are not Class I gaming or Class II gaming." 25 U.S.C. § 2703(8). For example, all electronic versions of Class II games are Class III gaming. Further examples of Class III gaming are those games typically found in Las Vegas and Atlantic City casinos, including slot machines, blackjack, roulette, and off-track betting. Class III gaming provides the majority of Indian gaming profits and typically involves larger stakes than Class I or Class II gaming; thus, closer regulation is required. For a tribe to offer Class III gaming, the tribe must meet the authorization requirements under IGRA; that is, the gaming must be authorized by a tribal ordinance approved by the National Indian Gaming Commission (the "NIGC"), permitted by the state for some person or organization, and covered by a tribal-state compact. IGRA requires a tribal-state compact before Class III games may be offered. It is within the State's discretion whether to enter into such a compact, however, the IGRA requires that both the state and tribe negotiate in good faith for the purpose of entering into such a compact. *See* 25 U.S.C. § 2710(d)(3)(A).

The Nation has satisfied the IGRA's requirements with respect to Class III gaming at the Turning Stone Casino. The State and the Nation executed a Compact (the "Compact") in April 1993 and the Acting Assistant Secretary for Indian Affairs of the United States Department of the Interior approved the Compact on June 4, 1993, as required by 25 U.S.C. § 2710(d)(3)(B). There is a list of "ap-

proved" games in Appendix A to the Compact. Nation–State Compact, app. A. By the terms of the Compact:

The Nation may request that additional games or activities, or new specifications for existing games or activities, be added to Appendix A by submitting written specifications to the State. The State shall within fifteen (15) days notify the Nation that it accepts or rejects the game or activity for Appendix A to the Compact. If the State accepts the game or activity, the game or activity and its specifications shall be added to Appendix A effective as of the date of the State's acceptance of that game or activity.

Nation–State Compact § 15(b)(3).

The Nation made a written request to the New York State Racing and Wagering Board (the "Board") dated November 22, 1994, to amend Appendix A to include Multi–Game and its specifications. With mercurial speed, on November 23, 1994, the Board sent written approval of the requested amendment adding Multi–Game to Appendix A. The Nation began offering Multi–Game at its Turning Stone Casino on March 10, 1995. On that same day, the Secretary to the Governor of New York, Bradford J. Race, Jr., sent a letter to Nation Representative Ray Halbritter stating that Multi–Game was not authorized under Appendix A. The State's position was, and is, that the Board did not have the authority to amend Appendix A and, thus, the appendix was not amended to include Multi–Game. Accordingly, the State asserted, and continues to assert in the present litigation, that the Nation's offering of Multi–Game violates the Compact because the Nation did not receive appropriate approval in accordance with the Compact.

The Nation continues to operate Multi–Game at the Turning Stone Casino.

### B. Procedural History

The State commenced this action in the Spring of 1995. The State's Complaint

seeks a declaration that the Nation is violating the Compact by offering Multi–Game and an injunction prohibiting the Nation from operating Multi–Game at the Turning Stone Casino pursuant to 25 U.S.C. § 2710(d)(7)(A)(ii).

In the Fall of 1995, the Nation moved to dismiss the Complaint, raising a number of defenses, one of which was the Compact's mandatory arbitration clause. In a bench opinion, this Court ruled that the State's claim was covered by the mandatory arbitration clause and, thus, dismissed the claim for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1). On appeal, the Second Circuit reversed and remanded for further proceedings, holding that the case is not subject to mandatory arbitration because the parties specifically excluded it from the general arbitration clause. *See The State of New York v. The Oneida Indian Nation of New York,* 90 F.3d 58 (2d Cir.1996).

Upon remand, the action was stayed upon the stipulation of the parties and the order of the Court in an effort to facilitate settlement. Once settlement attempts stalled, however, the Nation filed the present motion to dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(1) and (6).

On January 12, 1999, the Court heard oral argument on Defendants' motion to dismiss. By agreement of the parties, the Court reserved decision on the Nation's motion and stayed the action based on its understanding that the parties were progressing toward settlement. The parties were instructed to file status reports with this Court every forty-five (45) days and advised that if a settlement agreement had not been entered by December 15, 1999, the stay would be lifted and a decision on the Nation's pending motion to dismiss would be rendered. The parties filed a status report dated November 29, 1999 which indicated that, although settlement negotiations continued, an agreement had not been reached. Noting that this case has been pending for nearly five years while the parties attempted to reach settlement and pursuant to its earlier direction, this Court will now lift a stay and render a decision on the motion to dismiss.

## II. DISCUSSION

The Nation moves to dismiss the State's Complaint pursuant to FED. R. CIV. P. 12(b)(1) and (6). The Nation advances five arguments for dismissal: (1) the Complaint fails to allege a violation of the Compact; (2) the Complaint fails to allege that the Board lacked authority to approve new games such as Multi–Game; (3) the doctrine of primary jurisdiction requires the State to present its claim to the NIGC before commencing a federal suit; (4) the Nation's sovereign immunity bars the State's claims; and (5) the Supreme Court's decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114 (1996), operates to invalidate the statutory subsection upon which the State sues.

The standards for dismissal under Rule 12(b)(1) and (6) are well-settled and need not be restated here. The Court has set forth the appropriate standard to be applied in numerous published decisions. *See, e.g., Anheuser–Busch v. G.T. Britts Distrib., Inc.,* 44 F.Supp.2d 172, 174 (N.D.N.Y.1999). The Court will apply the standard as stated in those cases and *Burnette v. Carothers,* 192 F.3d 52 (2d Cir. 1999) to the Nation's motion to dismiss.

### (1) Sovereign Immunity

The Nation first challenges federal jurisdiction on the ground of tribal sovereign immunity. Specifically, it contends that: (1) it has not waived its sovereign immunity by entering into the Compact; and (2) the IGRA, 25 U.S.C. § 2710(d)(7)(A)(ii), does not abrogate its sovereign immunity.

■ As a matter of federal law, "[s]uits against Indian tribes are . . . barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112

(1991). "[A] waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (internal quotations omitted).

■ In the present case, the Nation waived its sovereign immunity by entering into the Compact. Section 14(a) of the Compact specifically provides that the State may, as here, bring a claim pursuant to 25 U.S.C. § 2710(d)(7)(A)(ii) that the Nation is conducting a Class III gaming activity not authorized by the Compact. It is settled that "[t]o agree to be sued is to waive any immunity one might have from being sued." *See Sokaogon Gaming Enter. Corp. v. Tushie–Montgomery Assoc., Inc.,* 86 F.3d 656, 659–60 (7th Cir.1996). Indeed, "[n]o one reading this clause could doubt that the effect was to make the tribe suable." *See id.* at 659–60; *see also Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050 (9th Cir.1997), *cert. denied,* 524 U.S. 926, 118 S.Ct. 2319, 141 L.Ed.2d 694 (1998).

The Nation's reliance on section 19 of the Compact for the contrary position is unconvincing. That section provides as follows: "[e]xcept as specifically provided herein, neither the State nor the Nation waives its sovereign immunity, under either state or federal law or arising from native existence, by entering into the Compact." Section 19, however, explicitly recognizes the Nation's waiver of sovereign immunity elsewhere in the Compact, i.e., section 14, as noted above.

Alternatively, this Court has jurisdiction because the IGRA abrogated the Nation's sovereign immunity where, as here, the State is seeking declaratory or injunctive relief resulting from an alleged violation of an existing Tribal–State compact authorizing Class III gaming. *See Florida v. Seminole Tribe of Florida,* 181 F.3d 1237, 1242 (11th Cir.1999). Section 2710(d)(7)(A)(ii) (the "A(ii) provision") provides district courts with jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact entered into." In *Kiowa Tribe of Oklahoma v. Mfg. Tech., Inc.,* 523 U.S. 751, 118 S.Ct. 1700, 1705, 140 L.Ed.2d 981 (1998), the Supreme Court referred to the A(ii) provision as an instance when Congress "has restricted tribal immunity from suit." This statement is supported by not only the plain language of the A(ii) provision, but also by other sections of the IGRA, which provide, for example, that Class III gaming is lawful only if conducted in conformance with a compact. *See* 25 U.S.C. § 2710(d)(1)(C).

A finding of congressional abrogation also finds support in the Supreme Court's decision in *Seminole,* 517 U.S. 44, 116 S.Ct. 1114, which found that Congress intended to abrogate the State's immunity under the (A)(i) provision. It would make little sense that the same Congress that intended abrogation of the states' immunity under the A(i) provision would have made a distinction in the very next jurisdictional provision for tribal sovereignty without any discussion that it intended a different immunity-based outcome.

Circuit Courts, however, have read the A(ii) provision narrowly. For example, in *Seminole Tribe of Florida,* 181 F.3d at 1242, the Eleventh Circuit found that in enacting the A(ii) provision, "Congress abrogated Tribal immunity only in the narrow circumstance in which a tribe conducts Class III gaming in violation of an existing Tribal–State Compact." The Eleventh Circuit went on to find that although the Seminole Tribe was engaging in Class III gaming without the authorization of a Tribal–State Compact and, thus, in violation of the IGRA, because a Tribal–State Compact did not exist, Congress had not abrogated the Tribe's immunity. *Id.*

In *Mescalero Apache Tribe v. State of New Mexico,* 131 F.3d 1379, 1385 (10th Cir.1997), the Tenth Circuit found that the IGRA abrogated the Tribe's immunity and

observed that Congress' "intent to abrogate tribal sovereign immunity by section (A)(ii) when a state seeks to enjoin gaming activities conducted in violation of any Tribal–State compact entered into seems equally clear and unmistakable." The Tenth Circuit also noted that "although *Seminole* held that Congress lacked the authority to abrogate states' Eleventh Amendment immunity through the Indian Commerce Clause, tribal sovereign immunity does not stem from the Eleventh Amendment." *Mescalero,* 131 F.3d at 1385.

Other courts have also found that the IGRA abrogated Indian sovereignty. *See Montgomery v. Flandreau Santee Sioux Tribe,* 905 F.Supp. 740, 745 (D.S.D.1995); *Calvello v. Yankton Sioux Tribe,* 899 F.Supp. 431, 438 (D.S.D.1995); *Maxam v. Lower Sioux Indian Community of Minn.,* 829 F.Supp. 277, 281 (D.Minn. 1993); *Cohen v. Little Six, Inc.,* 543 N.W.2d 376, 380 (Minn.Ct.App.1996), *aff'd,* 561 N.W.2d 889 (1997), *cert. denied,* 524 U.S. 903, 118 S.Ct. 2059, 141 L.Ed.2d 137 (1998). *But see Davids v. Coyhis,* 869 F.Supp. 1401, 1408–09 (E.D.Wis.1994)

In arguing that the IGRA and the existing Compact did not abrogate their tribal sovereign immunity, the Nation places great reliance on the Ninth Circuit's decision in *Cabazon,* 124 F.3d 1050, and the Eleventh Circuit's recent decision in *Seminole Tribe of Florida,* 181 F.3d 1237. Together, these cases can be read to hold that the IGRA alone does not abrogate sovereign immunity and tribal-state compacts abrogate immunity only with respect to gaming activities specifically addressed in a compact. From this reading, the Nation argues that in this case, the Compact only abrogated tribal immunity with respect to gaming activities specifically addressed in Appendix A. This reading, however, is narrow and contrary to the wording of both the Compact and the cases. As stated above, *Seminole Tribe of Florida* stands for the proposition that the IGRA abrogates tribal immunity with

respect to gaming activities *subject to* a Tribal–State compact. 181 F.3d at 1242 (emphasis added). Although in *Cabazon* the Ninth Circuit found that gaming activities that were not specifically mentioned in the Tribal–State Compact at issue were outside its jurisdiction, again, the *Cabazon* court stated that it had "no jurisdiction over gaming activities that are not the *subject of* a Tribal–State compact" and that "under the IGRA a State does not have jurisdiction to enjoin activities that are not mentioned in the Compact." 124 F.3d at 1059–60 (emphasis added). The flaw in the Nation's argument is that it assumes that all Compacts are the same—they are not. The Compact here is of a different ilk than the one in Cabazon, such that although multi-game is not specifically listed as a permitted Class III gaming activity in Appendix A, it would be error to conclude that multi-game was not *subject to* the Compact.

In *Cabazon,* the tribe entered into a Tribal–State Compact with the State of California that authorized only simulcast horse racing. Subsequently, the tribe engaged in Class III gaming not authorized by the Compact and the State brought suit alleging a violation of the IGRA. The Ninth Circuit recognized that, in the absence of a compact, the jurisdiction to enforce the IGRA's prohibition on class III gaming rests with the federal government and concluded that a State did not obtain unlimited regulatory control over Class III gaming by virtue of a limited compact. *Id.* In reaching this conclusion, the Ninth Circuit recognized that a compact authorizing a specific game does not imply a promise not to operate other games.

The Compact at issue in the case at bar is clearly distinguishable from the compact before the Court in *Cabazon.* In the case at bar, the Nation entered into a Compact with the State that authorized a broad ambit of Class III gaming activities. Equally important, the Compact here envisions and provides for the offering of new games and section 15 of the Compact ex-

plicitly provides a detailed means for adding new games to the Nation's gambling repertoire. Moreover, prior to instituting multi-game, the Nation made a written request to the Board to amend Appendix A of the Compact to include multi-game and it's specifications. The action of the Nation in this instance indicates both that it understood the necessity of amending Appendix A prior to offering new Class III games and suggests that, subsequent to the Board's approval, the Nation believed that the Compact had been amended to include multi-game. Accordingly, multi-game and other Class III games not listed in the original Compact are "subject to" the Compact.

Additionally, unlike the compact at issue in *Cabazon*, the Compact before this Court anticipated a claim by the State that the Nation was violating the Compact by offering a Class III game not authorized by the Compact. Section 14(a) states "[a] claim by the State that the Nation is conducting a class III gaming activity not authorized by this Compact is not subject to mandatory arbitration . . . ." Accordingly, it is not necessary for this Court to "read an implied promise not to engage in other Class III gaming" into the Compact, *Cabazon*, 124 F.3d at 1060, in order to conclude that it has jurisdiction to hear this claim; rather, the Court need only look to the language of section 14(a) to find that the parties plainly contemplated federal jurisdiction over a suit such as this when they entered into the Compact.

Accordingly, sovereign immunity does not bar this action because the Nation waived its immunity, or alternatively, because the IGRA and the Compact at issue abrogated tribal sovereign immunity.

**(2) Does *Seminole* invalidate the (A)(ii) Provision?**

This brings the Court to the Nation's next argument, that the Supreme Court decision in *Seminole*, 517 U.S. 44, 116 S.Ct. 1114, destroyed the symmetry of section 2710(d)(7)(A) by holding that Con-

gress lacked the authority, under the Indian Commerce Clause, to abrogate the states' Eleventh Amendment immunity. The Nation asserts, therefore, that this suit under the A(ii) provision cannot stand because the careful balance of reciprocal rights embodied in section 2710(d)(7)(A) has been altered, a result it asserts that Congress would not have intended.

■ The Supreme Court's decision in *Seminole* did not consider whether the rest of the IGRA survives. This Court must, therefore, consider whether the IGRA survived *Seminole*. In determining severability, the Supreme Court has instructed as follows: "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987). Put another way, "the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted." *Id.* at 685, 107 S.Ct. 1476. When a severability clause is contained in a statute, a presumption arises in favor of severability. *Id.* "In such a case, unless there is strong evidence that Congress intended otherwise, the objectionable provision can be excised from the remainder of the statute." *Brock*, 480 U.S. at 685, 107 S.Ct. 1476.

■ The IGRA contains a severability clause. *See* 25 U.S.C. § 2721. Thus, a presumption arises in favor of severability. The Nation has failed to rebut that presumption; it has not introduced "strong evidence" suggesting that the IGRA is not severable. *See Brock*, 480 U.S. at 685, 107 S.Ct. 1476.

Furthermore, the Nation's argument that *Seminole* invalidated the IGRA as a whole has been rejected by another Court, the Eleventh Circuit, which decided the initial appeal of *Seminole*, 11 F.3d 1016, 1029 (11th Cir.1994), a ruling that the Su-

preme Court left undisturbed. *See Seminole*, 517 U.S. at 76, n. 18, 116 S.Ct. 1114. After finding that the Indian Commerce Clause did not grant Congress the power to abrogate a State's Eleventh Amendment immunity—thus requiring dismissal of the suit under § 2710(d)(7)(A)(i)—the Eleventh Circuit addressed the validity of the remainder of the IGRA. It found the IGRA severable, relying upon the severability clause in the IGRA and the absence of any "strong evidence to ignore that plain congressional directive." *Seminole*, 11 F.3d at 1029; *see also Mescalero*, 131 F.3d at 1385 (applying *Seminole* to deny a tribe's motion to strike a state's Eleventh Amendment defense and then holding that A(ii) provision is enforceable against tribe). The Eleventh Circuit also pointed out that by permitting a tribe to notify the Secretary of Interior—which could then prescribe regulations governing Class III gaming—the IGRA itself mitigated any imbalance resulting from a tribe's inability to bring suit against the state. *See Seminole*, 11 F.3d at 1029 (citing 25 U.S.C. § 2710(d)(7)(B)(vii)).

The Nation relies heavily on the Ninth Circuit decision in *United States v. Spokane Tribe of Indians*, 139 F.3d 1297 (9th Cir.1998), for the proposition that "Congress would not have permitted suits against Indian Nations had it known that its provision abrogating State sovereign immunity were invalid." Tribe Memorandum of Law, at 20. However, the Nation reads *Spokane* too broadly and does not account for the distinguishing factual circumstances which indicate that in this case the IGRA can function as Congress intended. *See U.S. v. 1020 Electronic Gambling Machines*, 38 F.Supp.2d 1219, 1223 (E.D.Wash.1999) (interpreting *Spokane* to mean that "the government may not enforce IGRA against Indian tribes unless circumstances have occurred that cause IGRA to function as Congress intended"). The concerns that led the Ninth Circuit to conclude that it would be improper to grant an injunction in the circumstances before it are not present here. *Spokane*

involved a suit brought by the United States against a tribe for engaging in gambling offerings in violation of IGRA (the "U.S. suit"). The district court preliminarily enjoined the tribe from offering many of the games in question. The U.S. suit was commenced while a federal lawsuit brought by the tribe was pending against the state for failure to negotiate a compact in good faith (the "Tribe suit"). Following *Seminole*, the State invoked its newfound Eleventh Amendment immunity to have the Tribe suit dismissed. The *Spokane* court, on appeal, addressed "the narrow question" whether after *Seminole* a preliminary injunction against a Tribe is authorized under these circumstances.

The *Spokane* court held that "the class III gaming provisions can't form the basis" for an injunction under these circumstances, relying on the IGRA's legislative history that the "tribe's right to sue the state is a key part of a carefully-crafted scheme balancing the interests of the states and the tribes." *Spokane*, 139 F.3d at 1300. Despite the perceived lack of balance after *Seminole* and the *Spokane* court's obvious concern that in some cases tribe's would be left powerless under the IGRA, *id.* at 1301, the Ninth Circuit found that the "IGRA ... remains valid and, under some circumstances, it may function close enough to what Congress had in mind to be enforceable by way of injunction. Most obviously, a state may waive its sovereign immunity and allow a tribe to sue it in district court; the IGRA would then function exactly as intended." *Spokane*, 139 F.3d at 1301. The *Spokane* court also acknowledged that resort to the Secretary of Interior, as provided under 25 U.S.C. § 2710(d)(7)(B)(vii), may also achieve Congress' goals. 139 F.3d at 1301–02.

In contrast to *Spokane* (where the state allegedly refused to bargain in good faith under the IGRA), in the case at bar we do not have the State distorting the process by invoking sovereign immunity. The State

has, in fact, entered into a Compact with the Tribe and there are no allegations that the State has not negotiated in good faith. Further, the Compact waives the State's sovereign immunity with respect to Class III gaming activities; thus, in this case, the balance between the Nation and the State struck by Congress in IGRA has not been upset. *See, e.g., U.S. v. Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation,* 33 F.Supp.2d 862 (C.D.Cal.1998) (applying *Spokane* and granting an injunction where State negotiated in good faith).

### (3) Primary Jurisdiction

The Nation's third argument is that under the doctrines of primary jurisdiction, exhaustion of administrative remedies, and ripeness, the Court must defer this dispute, in the first instance, to the NIGC, the federal agency that enforces IGRA.

■■■ The doctrine of primary jurisdiction is a flexible concept concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Board of Ed. v. Harris,* 622 F.2d 599, 606 (2d Cir.1979), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). Simply put, it "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." *Nat'l Communications Ass'n, Inc. v. Am. Tel. and Telegraph Co.,* 46 F.3d 220, 222–23 (2d Cir.1995) ("*AT & T*") (quoting *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952)). Typically, a court applies the doctrine of primary jurisdiction to cases involving factual or policy issues that fall within an agency's mandate from Congress. *See AT & T,* 46 F.3d at 223. The doctrine springs from the notion that Congress has entrusted the regulation of a certain subject matter to an administrative agency; thus, before a court takes any action to resolve a dispute, it should defer to the agency for guidance based on the agency's specialized knowledge. *See General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022, 1026 (2d Cir. 1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 661 (1988).

■■■ Although there is no magic formula for determining when the doctrine applies, the following four factors guide the inquiry: "(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *AT & T,* 46 F.3d at 222–223. Additionally, a court must "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *AT & T,* 46 F.3d at 223. A court ordinarily does not defer when the issue involved is purely a legal question, or when the issue does not implicate agency expertise or would not benefit from an agency's fact finding prowess. *See Harris,* 622 F.2d at 607.

■■■ Applying these factors here, deferral to the NIGC is not warranted. The Complaint does not raise technical or policy considerations within the specialized knowledge of the NIGC. *See, e.g., AT & T,* 46 F.3d at 223 (agency did not have primary jurisdiction where decision did not "present any issues involving intricate interpretations or applications that might need agency's technical or policy expertise"). Rather, the question here is simply whether the Nation has violated the Compact by offering Multi–Game. The Compact, moreover, does not include novel words or unusual language that may need specialized understanding.

Moreover, the State has not invoked the authority of the NIGC to resolve this dis-

pute. *Compare Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 60 (2d Cir.1994) ("deferral is fully warranted here where the plaintiff has already invoked [the Bureau of Indian Affair's] authority."); thus, there exists no danger of inconsistent rulings if the case is decided by the Court because the issue presented involves the interpretation of a particular Compact. *See Mason Tenders Dist. Council Welfare Fund v. ITRI Brick & Concrete Corp.,* 1997 WL 678164, *8–*9 (S.D.N.Y. Oct.31, 1997) (stating that there is no chance of inconsistent rulings when no application has been made to an agency).

Furthermore, this case has been pending for close to five years. There is no discernable reason to now halt these proceedings and defer to the NIGC for what might be a lengthy determination there when resolution of the matter here is approaching. *See Mason Tenders,* 1997 WL 678164, at *9, and cases cited therein; *Hill,* 39 F.3d at 60 ("There clearly is a public interest in reasonably prompt adjudication of plaintiff's claims.").

Accordingly, deferral is not warranted under the doctrine of primary jurisdiction. The Court further notes that the Nation's vague reliance on the doctrines of administrative exhaustion and ripeness are unpersuasive.

### (4) Violation of the Compact

▮ The Court now turns to the Nation's fourth argument that the Complaint, which relies upon the A(ii) provision, fails to state a claim because it contains no allegation of a Compact violation as required by that section. The A(ii) provision provides district courts jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal–State compact entered into." The Nation reads the Complaint as alleging that the unauthorized offering of Multi–Game is actually a violation of IGRA's requirement that Class III gaming be "conducted in conformance with a Tribal–State compact" instead of a violation of the Compact itself. *See* 25 U.S.C. § 2710(d)(1)(C). The Nation also contends that, to the extent the Complaint alleges that Multi–Game violates the Compact, "this allegation is wholly conclusory" and "there is no allegation ... of any Compact term that has been violated." *See* Nation Memorandum of Law, at 7.

The Court cannot agree for several reasons. First, the Complaint is replete with allegations that the Nation violated the Compact. For instance, paragraph one of the Complaint alleges that the Nation's offering of Multi–Game at the Turning Stone Casino violates the Compact. Similarly, paragraph 41 alleges that the Nation acted in violation of the terms of the Compact because Multi–Game has not been approved by the State.

Second, and contrary to the Nation's representation, paragraph 35 of the Complaint does allege a specific violation of the Compact—namely, section 15. That section addresses the parties' rights and obligations with respect to adding new gaming offerings, such as Multi–Game.

Third, looking beyond the style of the legal claim to the belly of the Complaint, it is plain that the underlying factual assertions support the conclusion that the Complaint alleges violations of the Compact. For instance, paragraph 39 of the Complaint asserts that "at the time the Nation made its request for the addition of a new game to Appendix A to add multi-game, the Nation knew or should have known that only the Governor or his authorized representative could approve a substantive change, consisting of the addition of a new game, to Appendix A of the Compact and only Patrick Brown was authorized to negotiate such a change."

Fourth, the Nation's characterization of the Complaint is directly at odds with the observation of the Second Circuit. On appeal of a prior decision of this Court, the Second Circuit stated: "It is clear *from the*

*Complaint* and from the arguments of counsel that the State's theory is that the Board did not have the authority to amend [A]ppendix A, and thus the appendix was not amended to include Instant Multi–Game. Thus, the State claims, Instant Multi–Game is not authorized by the Compact." *The Oneida Indian Nation of New York,* 90 F.3d at 62 (emphasis added).

Lastly, the Nation's reliance on the Ninth Circuit's decision in *Cabazon,* 124 F.3d 1050, which it believes is "directly on point," is faulty because, as detailed above, *Cabazon* is distinguishable on the facts. In this case, the State's Complaint specifically alleges that the Nation violates the Compact because it failed to follow the agreed upon procedures in offering Multi–Game.

Accordingly, this case does not present the same situation as *Cabazon* where the Ninth Circuit found that the State attempted to exercise regulatory control outside the ambit of the Complaint, and the Court finds that the Nation's argument that the Complaint does not allege a violation of the Compact is without merit.

### (5) Allegations that the Racing and Wagering Board Lacked Authority to Approve Multi–Game

The Nation's final argument is better viewed as raising two subarguments: (1) that the Complaint is facially deficient because it fails to allege that the Board lacked authority to approve Multi–Game; and (2) that even if the Complaint does allege lack of authority by the Board, the State's claim must nonetheless fail because under the plain terms of the Compact the Board had authority to approve Multi–Game.

The Nation's first subargument need not detain the Court long for the reasons previously explained. As noted, the· basic premise of the Complaint is that the Board did not have authority to authorize Multi–Game. Paragraph 31 of the Complaint, for example, alleges that "the Nation was or should have been aware that it had not received approval form the state to operate [Multi–Game]." Similarly, paragraphs 15 and 18 allege that it is only the State that can approve new games and that the State is defined differently than the Board. Accordingly, the Nation's first subargument fails.

The Nation's second subargument is that the Complaint fails to state a claim because under the plain terms of the Compact the Board had authority to approve Multi–Game. To this end, the Nation points to several sections of the Compact. It begins with section 15(b)(3) of the Compact, which provides that "[i]f the State accepts [a proposed] game or activity, the game or activity and its specifications will be added to Appendix A." It then points to section 4(a), which provides that "[t]he state shall exercise its regulatory and oversight role under this compact through its [Board]." It concludes, therefore, that the plain meaning of the "regulatory and oversight role" encompasses the approval of new games under the Compact. It also points to prior practice, as evidenced in the Complaint, that the Board had previously negotiated amendments to existing games.

The State, by contrast, points out that the Compact explicitly recognizes the distinction between the Board and the State by separately defining them and their roles. The State contends that, under the plain terms of the Compact, only the State is authorized to approve new games requested by the Nation. *See* Compact, 15(b)(3). The State continues that the Compact restricts the Board's role to a regulatory and oversight one, a function defined separately from gaming changes. With respect to amendments, the State continues that the Board's role is limited to providing notice to the Nation when the State has approved a new game elsewhere. Compact, § 15(b)(1).

■■■ The Supreme Court has stated that a compact is akin to a contract. *See Texas v. New Mexico,* 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987) (quoting *Petty v. Tennessee–Missouri*

*Bridge Comm'n,* 359 U.S. 275, 285, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959) (Frankfurter J., dissenting)); *see also Oklahoma v. New Mexico,* 501 U.S. 221, 242, 111 S.Ct. 2281, 115 L.Ed.2d 207 (1990) (Rehnquist, C.J., concurring in part and dissenting in part); *Pueblo of Santa Ana v. Kelly,* 104 F.3d 1546, 1556 (10th Cir.1997). Thus, in interpreting the Compact, the Court is guided by ordinary principles of contract interpretation.

The determination of whether contract language is ambiguous is a question of law. *See O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc.,* 37 F.3d 55, 58 (2d Cir.1994). If the contractual language is clear, the granting of a dispositive motion is appropriate. *Id.* Conversely, if the contract language is ambiguous, a question of fact arises for a jury determination. *Id.*

■■■ After consideration, the Court cannot agree with the Nation that, as a matter of law, the Compact plainly and unambiguously vests authority with the Board to approve new games like Multi–Game. At minimum, the Compact is ambiguous in that regard for substantially the reasons argued by the State. Further, the Nation's reliance on outside materials to support their interpretation, including correspondences between the Board and the Nation, is not appropriate on this 12(b)(6) motion. *See* FED. R. CIV. P. 12(b). In short, the Court finds that the State's Complaint states a claim against the Nation for offering Multi–Game at the Turning Stone Casino in violation of the Compact.

## III. CONCLUSION

The Stay in this action is vacated and for the foregoing reasons, the Nation's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and (6) is DENIED in all respects. IT IS SO ORDERED